In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3137

FREDERICK MOORE and TOMMIE GRADY
as Co-Administrators and Personal Representatives
of the Estate of FREDERICK GRADY,

*Plaintiffs-Appellants*,

*v.*

DONALD TULEJA, DEMETRIUS WILLIAMSON,
JOSEPH PALMSONE, and DENNIS BOYLE,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 2545—**Ruben Castillo,** *Judge.*

ARGUED MAY 29, 2008—DECIDED OCTOBER 6, 2008

Before CUDAHY, POSNER and TINDER, *Circuit Judges.*

CUDAHY, *Circuit Judge.* On the evening of April 8, 2003, Frederick Grady was involved in a major traffic accident. Although Grady escaped without serious injury, his van rolled over on its side and was severely damaged. Later that night, Grady was arrested when he trespassed on the

private lot where his damaged van was being held. He was taken to a Chicago police station and placed in a holding cell. In the early morning hours of April 9, 2003, Grady was found unconscious and unresponsive in his cell. Attempts by paramedics to revive Grady were unsuccessful, and Grady tragically died. An autopsy conducted by the Cook County Office of the Medical Examiner concluded that Grady had suffered a fatal heart attack.

Although the autopsy concluded that Grady died from natural causes, injuries found on Grady's body raised suspicion in the minds of his family and friends. They believe that Grady had been beaten in his cell by jail personnel and that this beating precipitated the fatal heart attack. The plaintiffs, co-administers of Grady's estate, brought this suit under 42 U.S.C. § 1983, claiming that the defendant police officers and jail personnel deprived Grady of his rights under the Fourth and Fourteenth Amendments by using excessive force and denying him medical care.

The case was tried before a jury. The trial lasted seven days; the jury heard all of the plaintiffs' evidence and returned a verdict in favor of the defendants in just over an hour. The plaintiffs made a motion for a new trial but the district court denied the motion, noting that the jury's verdict was reasonable in light of the "weak liability case" presented by the plaintiffs. The plaintiffs now appeal the denial of their motion for a new trial. We AFFIRM.

## I.

Grady was involved in two separate car accidents on April 8, 2003. The first was relatively minor. The second, which occurred at roughly 6:30 p.m., was more serious. In that accident, Grady's van crossed out of its lane and struck another vehicle, causing both vehicles to flip over. Officer Andrew Lucca of the Chicago Police Department responded to the scene, as did paramedics Renee Sanchez and John Kaveney. Grady was wearing his seat belt and escaped the crash with only minor bumps and bruises. He initially refused medical treatment and refused to be taken to the hospital. Grady, who worked as a carpenter, told Sanchez that he had to go back to get his carpentry tools out of his van. Sanchez warned Grady that he should stay away from the van because "there was broken glass and stuff." Despite the warning, Grady reached into the van, cutting his right hand rather seriously in the process. The paramedics bandaged Grady's hand—a fact that they recorded in their log—and replaced the dressing once more after Grady bled through the first bandage. Grady again refused to be taken to the hospital. Instead, he was released.

At 8:45 p.m. that evening, Grady trespassed on the lot where his van was being stored in an attempt to retrieve his tools. The lot owner called the Chicago Police Department. Officers Leo Morales and Luis Garza arrived at the scene and arrested Grady. As Officer Morales placed Grady in handcuffs, he noticed the bandage on Grady's hand. Officers Morales and Garza confiscated Grady's tools and took him back to the station. They handcuffed

Grady to a bench in the police station while they filled out the arrest report. At that point, Officer Garza noticed the bandage and asked Grady what had happened. Grady told him that he had a car accident but did not elaborate; Grady also declined medical assistance. The arrest report, which focused on the facts surrounding the alleged criminal trespass, did not mention the injury to Grady's hand.

Officers Morales and Garza then uncuffed Grady and turned him over to lockup personnel. There was a strict policy against handcuffs in the lockup, and Officer Morales stated that he took the handcuffs with him. Grady was processed by Officer Donald Tuleja, who did a quick medical check of Grady while he sat behind a desk. He did not observe any active bleeding, and Grady denied that he needed medical care. The intake report did not note the bandage on Grady's hand. Palmsone took Grady's photograph; Williamson took his fingerprints. The photograph reveals that Grady had no injuries to his head when he entered the jail. Although neither Palmsone nor Williamson noticed the bandage on Grady's hand, no fingerprint was taken of Grady's right hand. Grady was apparently cooperative with jail personnel, who allowed him to make a phone call. Grady called his longtime companion, Kathryn Tierno, and told her that he was "very concerned about his tools." Grady was then walked to his cell, which contained a toilet, a sink and a metal bench. Robert Gonzales, who was in the cell next to Grady, saw Grady being taken to his cell and noticed the bandage on his hand.

Personnel at the jail made rounds of the lockup every fifteen minutes. Grady was calm and courteous. On one occasion, Grady asked Williamson about his tools. Palmsone, who made the majority of rounds, said that Grady slept most of the night. Gonzales, who was in the cell next to Grady, remembered hearing nothing but coughing and snoring coming from Grady's cell. When Palmsone made his rounds at 1:30 p.m., he noticed Grady sitting up on his bench. Approximately ten minutes later, Gonzales stated that he heard a "thump" in Grady's cell followed by silence. When Palmsone made his rounds at approximately 1:45 p.m., he found Grady unconscious and unresponsive on the floor of his cell. Palmsone ran to get Officer Tuleja, who called Sergeant Dennis Boyle and Captain Raymond Miller for help. A log reflects that the fire department and paramedics were called at 1:45 p.m. Sanchez and Kaveney arrived to find Grady in a state of cardiac arrest on the cell floor. They were unable to resuscitate him. Grady was taken to the hospital, where he was pronounced dead. An autopsy conducted by Dr. Eupil Choi determined that Grady had died naturally of a heart attack. The autopsy also revealed that Grady had a number of injuries to his body, including a hand laceration, two abrasions on his head and scrapes on his wrist and neck. Sergeant Boyle examined the cell and found no signs of struggle; investigators from the office of internal affairs arrived later and also examined the cell. They too found no evidence of wrongdoing.

The plaintiffs filed this action under 42 U.S.C. § 1983 action on April 8, 2004. They alleged that Williamson and Palmsone used excessive force on Grady, that Officer

Tuleja failed to intervene and that Sergeant Boyle and Captain Miller denied Grady medical care. The plaintiffs also alleged that Officers Morales and Garza had arrested Grady without probable cause.[1] The plaintiffs' theory was that Grady angered Palmsone and Williamson by constantly complaining about his tools. Palmsone and Williamson had finally "snapped," striking Grady—who the plaintiffs believe was still handcuffed—with a baton. As Grady raised his hands to defend himself, the baton lacerated his hand and the force of the blow knocked the handcuffs into Grady's wrists and against his head, causing abrasions. The plaintiffs claim that Officer Tuleja saw the beating take place but failed to intervene. Further, they claim that Sergeant Boyle and Captain Miller delayed calling the paramedics until after the defendants had finished cleaning the cell and concealing evidence of the use of excessive force.[2] The plaintiffs' case focused almost entirely on inferences based on the nature of the injuries found on Grady's body; they claimed that the only reasonable medical conclusion was that Grady had been struck with a blunt object in his cell.

The jury trial lasted seven days. The jury heard testimony from almost all of the individuals who came into contact

---

[1] The district court granted summary judgment in favor of Officers Morales and Garza. The plaintiffs do not appeal this decision.

[2] During the trial, the district court granted judgment as a matter of law as to Captain Miller. The plaintiffs do not appeal this decision.

with Grady that day, including Officer Morales, Officer Garza, Officer Tuleja, Palmsone, Williamson and Gonzales. They all denied that any wrongdoing had taken place. Dr. Choi, who conducted the original autopsy of Grady, testified at trial that he believed that Grady's death was natural. The plaintiffs retained Dr. Michael Kaufman to reexamine Dr. Choi's work but, after conducting his own autopsy, Dr. Kaufman also concluded that Grady's death was natural. The plaintiffs' case was based almost entirely on testimony of Dr. Besant-Matthews, who did not have an opportunity to examine Grady's body but reviewed the medical evidence in the case. The jury returned a verdict in favor of the remaining defendants in a little more than an hour. The plaintiffs moved for judgment as a matter of law under Rule 50(b) or a new trial under Rule 59(a) but the district court denied the motions. The plaintiffs now appeal the denial of their post-trial motions.[3]

## II.

The plaintiffs argue that the district court erred in denying their motion for a new trial under Rule 59(a). *See* FED. R. CIV. PRO. 59(a). We review the denial of a motion for a new trial for abuse of discretion. *See Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004). "A party seeking to reverse a district court's denial of a motion for a new

---

[3] We decline to review the denial of the Rule 50(b) motion because the plaintiffs did not file a motion for directed verdict before the jury returned its verdict. *See Van Bumble v. Wal-Mart Stores, Inc.*, 407 F.3d 823, 827 (7th Cir. 2005).

trial bears a particularly heavy burden." *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004). A verdict will be set aside as contrary to the manifest weight of the evidence only if "no rational jury" could have rendered the verdict. *See King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006). Jury verdicts deserve particular deference in cases with "simple issues but highly disputed facts." *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995). We conclude that there was a reasonable basis for the jury's verdict in this case.

We begin with the common ground. Each of the medical experts that testified at trial (Dr. Choi, Dr. Kaufman and Dr. Besant-Matthews) diagnosed Grady with severe valvular heart disease. Dr. Choi and Dr. Kaufman also diagnosed him with severe coronary atherosclerosis. All of the experts agreed that these conditions had gone undiagnosed and were already very advanced. Thus, the parties agree that Grady suffered a fatal heart attack.

The disputed issue concerns the trigger for the heart attack. Dr. Kaufman and Dr. Choi both testified that Grady died a natural death. Grady already suffered from two serious heart diseases that were highly advanced. Any stress he experienced, whether physical or emotional, would increase the likelihood of a fatal heart attack.[4]

---

[4] The plaintiffs insist that Dr. Kaufman violated a pre-trial ruling when he stated that Grady had a stressful day. Some background is in order here. Before trial, the plaintiffs intended to have Dr. Besant-Matthews testify that Grady, who carried his

(continued...)

Indeed, Grady could have suffered the heart attack without any apparent triggering event at all. Many individuals who suffer from this type of advanced heart condition simply die in their sleep. Dr. Kaufman emphasized that Grady was "living on borrowed time" and could have simply "dropped dead suddenly and unexpectedly." Dr. Besant-Matthews, however, testified that the nature of the injuries to Grady—a hand laceration, two head abrasions and scrapes on his wrists—indicated that all of the injuries occurred at the same time and that Grady had most likely been beaten with a baton by jail personnel.

We turn first to the hand laceration. The plaintiffs assert that this injury was sustained while Grady was fending off the alleged attack in the cell. But they face an uphill battle in their attempt to prove that there is no reasonable

---

[4] (...continued)

own drum set to blues concerts and worked long hours as a carpenter, was better able to endure the stress of an accident and an arrest than an average person would be. The defendants moved to bar this line of questioning. The district court agreed, ruling that "no one can testify about what was stressful to Mr. Grady." The essence of this ruling was that, while the experts could discuss stress in general, they could not speculate about whether Grady had a particular resistance to stress.

Our review of the transcripts makes clear that when Dr. Kaufman testified that the accidents and arrest were stressful to Grady, he meant that such events would have been stressful to anyone. Indeed, when asked by defense counsel whether he was "speculating that these issues caused stress to Mr. Grady," Dr. Kaufman responded, "Any one, yes."

basis to conclude otherwise. Paramedics Sanchez and Kaveney both testified at trial that they were present when Grady injured his hand reaching into his van and their log reflects that they treated this wound at the scene of the accident. Officers Garza and Morales, as well as fellow arrestee Gonzales, testified that they saw the bandage on Grady's hand before he entered his cell.[5] Nevertheless, the plaintiffs argue that this testimony may be disregarded because it is contrary to "indisputable" laws of nature. *See, e.g.*, *Kansas City Pub. Serv. Co. v. Shepard*, 184 F.2d 945, 947 (10th Cir. 1950). They contend that Grady could not have cut himself on broken glass because the autopsies revealed "bridging," or intact intermediate tissue, in the hand laceration. Bridging is a common sign of blunt force trauma, and the plaintiffs claim that it is fundamentally inconsistent with the defendants' theory that Grady cut his hand on a sharp object. Contrary to the plaintiffs' assertions, however, Sanchez and Kaveney never claimed to have seen exactly how Grady's hand was "cut." Sanchez testified that "the doors were bent because of the accident" and that Grady "either grabbed the door or grabbed something on the seat and cut his hand." When pressed on this question, Sanchez stated, "All I know is that Mr. Grady went to his car . . . and he went to reach

---

[5] The plaintiffs argue that Gonzales contradicted himself on this point. Specifically, they note that Gonzales testified that he saw the bandage on Grady's hand but later testified that Grady did not appear injured. This semantic argument hinges on the meaning of "injury." The extent to which Gonzales was actually impeached on this point was for the jury to determine.

for something, [and] ended up cutting himself." This testimony is thus consistent with that of Dr. Kaufman, who testified that the hand laceration could have resulted from moving the hand over a fixed, jagged object—like the bent metal door of the van. Because we cannot determine exactly how Grady's hand was lacerated, we cannot say Sanchez's testimony was contrary to the "indisputable" laws of nature.[6] Thus, there is a reasonable basis in the record for the conclusion that Grady's hand was injured at the scene of the accident.

We turn now to the head abrasions. It is undisputed that Grady sustained these injuries while he was in police custody; photographs taken when Grady was originally processed revealed no visible injuries to his head. All of the medical experts agreed that the head abrasions were minor: there was no evidence of fractures, trauma or hemorrhaging. There was also very little bleeding, which suggested to all of the experts that the abrasions occurred around the time of death. Dr. Besant-Matthews theorized that the abrasions were defensive wounds sustained during the alleged beating. He claims that the force of the baton blow must have knocked Grady's handcuffs into his head. As numerous witnesses testified, however, Grady was not wearing handcuffs at the time. Officer

---

[6] The plaintiffs also argue that the lack of clotting in the wound indicates that it could not have been sustained seven hours earlier. But both Dr. Kaufman and Dr. Choi concluded that Grady received the bandage at least an hour before his death, and Dr. Kaufman concluded that the injury had been sustained at the scene of the accident.

Morales specifically remembers taking his handcuffs with him, and there was a strict policy against handcuffs in the lockup. Dr. Kaufman testified that Grady had most likely fallen unconscious and struck his head—first on the corner of the metal bench and then on the ground.[7] This testimony is consistent with the testimony of Gonzales, who was in the cell next to Grady and claimed that he never heard a struggle in Grady's cell, only a loud "thump" followed by silence. Dr. Kaufman's testimony, as corroborated by Gonzales, provides a reasonable basis for the jury to have concluded that the head abrasions occurred as Grady fell to the floor after the heart attack.

Finally, we turn to the scrapes on Grady's wrists. Dr. Besant-Matthews concluded that these scrapes were also sustained during the alleged beating, when the baton blows forced the handcuffs into Grady's wrists. As we have already explained, however, there is no evidence that a beating took place and no evidence that Grady was in handcuffs at the time. Dr. Kaufman testified that the scrapes likely occurred while Grady was handcuffed to the bench in the police station. For all we know, the

---

[7] The plaintiffs claim that Dr. Kaufman contradicted himself on this point. In fact, Dr. Kaufman originally *assumed* that Grady had received the head abrasions during the car accident. When he learned that the two abrasions were sustained in the cell, he was initially skeptical that they could have resulted from a fall. When he learned that there was a metal bench in the cell, however, Dr. Kaufman concluded that the two abrasions could have been incurred during one fall.

scrapes could have been sustained during the car accident. This argument provides no basis for a new trial.

We do not overturn jury verdicts lightly. All of the plaintiffs' evidence was presented to a jury over the course of a seven-day trial. Our role is a narrow one: we must simply determine whether a "reasonable basis exists in the record to support the verdict." *Trzcinski v. American Cas. Co.*, 953 F.2d 307, 315 (7th Cir. 1992). The testimony given by the police officers, jail personnel, paramedics and, most importantly, his fellow arrestee established that Grady was not beaten in his cell. This testimony was corroborated by two medical experts who had performed full autopsies of Grady's body, Dr. Choi and Dr. Kaufman. Given the speculative nature of the plaintiffs' theory in this case, the record certainly provides a reasonable basis for the jury's decision.

### III.

The plaintiffs also argue that defense counsel made inappropriate remarks at closing argument that require reversal. When explaining that the City of Chicago would indemnify the defendants in the event that they could not pay damages, defense counsel made the following statement: "The city is not a random amorphous entity. It's you. We're talking about tax dollars here." Closing remarks that appeal to jurors' pecuniary interests as taxpayers are, of course, generally improper. *Cf. United States v. Schimmel*, 943 F.2d 802, 806 (7th Cir. 2001).

But the plaintiffs did not object to this statement at trial. While the plain error doctrine is often applied in criminal

cases; it is rarely applied in civil cases. *See Stringel v. Methodist Hosp. of Ind., Inc.*, 89 F.3d 415, 421 (7th Cir. 1996). Plain error is only available in civil cases if a party can demonstrate that: (1) exceptional circumstances exist; (2) substantial rights are affected; and (3) a miscarriage of justice will occur if plain error review is not applied. *See, e.g., Estates of Moreland v. Dieter*, 395 F.3d 747, 756 (7th Cir. 2005). Because the plaintiffs have made no at-tempt—either in their briefs or at oral argument—to show that these elements have been satisfied, we decline to review for plain error. *See Ammons-Lewis v. Metro. Water Reclamation Dist.*, 488 F.3d 739, 744 (7th Cir. 2007).

## IV.

For the foregoing reasons, the decision of the district court is AFFIRMED.