# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2877

DONNA L. LEWIS,

*Plaintiff-Appellant*,

*v.*

CITY OF CHICAGO POLICE
DEPARTMENT, CITY OF
CHICAGO, and TERRENCE
WILLIAMS,

*Defendants-Appellee*s.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 6050—**Ruben Castillo**, *Judge*.

ARGUED OCTOBER 5, 2009—DECIDED DECEMBER 21, 2009

Before EVANS and SYKES, *Circuit Judges*, and SIMON,
*District Judge.*[1]

SIMON, *District Judge.* Chicago police officer Donna
Lewis claims she was discriminated and retaliated

[1] The Honorable Philip P. Simon of the United States District
Court for the Northern District of Indiana, sitting by designa-
tion.

against by the City of Chicago and her supervisor, Lt. Terrence Williams. Her claim was initially borne out of a decision by Williams to deny her request to participate in a special security detail in Washington, D.C. The acorn of that decision has produced an oak tree of litigation. Initially, the district court granted Defendants summary judgment. Lewis appealed that decision and won, in part. This Court reversed and remanded as to her gender discrimination claim against both Defendants and her retaliation claim against the City. *Lewis v. City of Chicago ("Lewis I")*, 496 F.3d 645, 656-57 (7th Cir. 2007). At the subsequent trial, the jury returned a verdict in favor of Williams and the City on both claims. The district court denied Lewis's motion for a new trial, and Lewis appeals. She raises no less than fifteen issues which she claims warrant a remand and a new trial. Finding none of these issues to have merit, we now affirm.

## I. BACKGROUND

Williams began supervising Lewis, an officer in the tactical unit ("TACT"), when Williams became the Tactical Lieutenant in the summer of 2002. In September of that year, the Washington, D.C. police department requested other departments to provide officers to assist with a security detail surrounding a meeting of the International Monetary Fund ("IMF"). Chief James Maurer wrote a memo addressing the IMF detail, announcing that "[b]ecause of hotel accommodations, a lone female officer will not be sent since there are two persons to each room. Therefore, recommend a minimum of two female officers."

Assignment to the detail was limited to officers in the TACT, Gang or Special Operations ("SOS") units. Chief Maurer testified that even though the memo only referred to females, the actual policy demanded that individual officers could only be sent if an even number of that person's gender was going, regardless of whether the gender was male or female.

Lewis felt the IMF detail was a good career opportunity and that she met all the requirements. She applied, but her supervisor Williams took her off the list. According to Lewis, Williams told her, "I took your name off the list because you're female" and "the trip was going to be dangerous and a working trip and that you will thank me for it later." Williams denies saying anything of the sort. He says that he removed her from the list because no other females from her district signed up. Lewis lost out on the training experience and some overtime pay.

Shortly after being denied participation in the IMF detail, Lewis filed a grievance over the decision. She says this triggered several acts of retaliation including being ordered to investigate a CAPS complaint by herself. CAPS complaints are initiated by citizens and are investigated by the police department. Williams told her, "[I]f you feel like you need an assist, get a car off the watch." Lewis says this was a sarcastic remark, implying that if she couldn't handle the assignment by herself, she should call over the radio for a uniformed officer to assist. Lewis investigated the complaint and later filled out a report that she says her supervisors repeatedly rejected without reason. The supervisors claim it was rejected because it was incomplete.

Another act of retaliation, according to Lewis, occurred on October 4, 2002, when Williams instructed Lewis's car to respond to a "shots fired" call. Lewis and the two other officers in the car with her were already in the process of responding to the call. They conducted the investigation without incident.

In January 2003, Williams transferred Lewis from the TACT to the Gang unit, reassigning her to a new partner. This was another act of retaliation according to Lewis. Lewis learned that her new partner, Macon, was known to want a transfer out of the unit and was less eager to conduct aggressive police work. The reassignment afforded what Lewis felt were fewer chances for over-time and more desirable assignments. She was later reassigned to another partner after Officer Macon moved to a different unit.

Lewis then requested a transfer to the SOS unit, which would have placed her outside of Williams's supervision. That request was denied by Chief Maurer, along with the request of three other officers from Lewis's district who requested transfers to the SOS unit at around the same time. In fact, only two of ten total applicants during that period were accepted into the SOS unit.

On March 12, 2003, Williams received notice that Lewis had filed an EEOC charge concerning the IMF detail and her claims of retaliation. The next day, Lewis was in her squad car responding to a burglary-in-progress call when a voice Lewis claims belonged to Williams came on the radio and ordered her to assist with a narcotics team operation. While assisting the narcotics team with a forced entry, Lewis was hit in the head with a sledge-

hammer by another officer. She suffered a fractured neck and is now on a permanent disability leave. The sledge-hammer struck Lewis while in the other officer's backswing. There is no indication that the incident was anything other than an accident. Lewis believes that being ordered to assist the narcotics team was another example of her being put in dangerous situations by Williams in retaliation for her filing the EEOC charge.

## II.  ANALYSIS

Lewis has four broad categories of complaints about how her trial was conducted. She believes that the jury was given incorrect instructions on the law, that there were several evidentiary errors, that the City's closing argument was prejudicial and that there was insufficient evidence for the jury to have found for the Defendants. We take each up in turn.

### A.  Jury Instructions

Lewis makes a total of seven challenges to the jury instructions. We start with a general discussion of the law governing challenges to jury instructions and then move to Lewis's specific issues. We review challenges to jury instructions *de novo* and afford the district court "substantial discretion with respect to the precise wording of instructions so long as the final result, read as a whole, completely and correctly states the law." *United States v. Gibson*, 530 F.3d 606, 609 (7th Cir. 2008). When it comes to potentially confusing or misleading instructions,

the reviewing court is to first ask if "the correct message was conveyed to the jury reasonably well." *Dawson v. New York Life Ins. Co.*, 135 F.3d 1158, 1165 (7th Cir. 1998). This inquiry is done by examining the instructions as a whole, in a common sense manner, avoiding nitpicking. *Id*. If the instructions fail in this regard, a new trial is appropriate only if the instruction prejudiced the complaining party. *Id*.

When a party fails to object to an instruction, the court will reverse only if there was a "plain error affecting substantial rights." FED. R. CIV. P. 51(d)(2) (2008). Plain error review of jury instructions is "particularly light-handed." *United States v. DiSantis*, 565 F.3d 354, 361 (7th Cir. 2009) (quoting *United States v. Griffin*, 84 F.3d 912, 925 (7th Cir. 1996)).

### 1.   *Blending of Discrimination and Retaliation Instructions*

The final set of instructions read to the jury included separate instructions for the discrimination and retaliation claims. Lewis maintains that certain aspects of the instructions could have confused the jurors into incorrectly thinking that Lewis had to prove discrimination *and* retaliation to prevail on her retaliation claim.

The discrimination instruction came first, and it outlined the various elements of Lewis's discrimination claim. The next two pages of instructions contained short paragraphs introducing general retaliation law. Following that came five paragraphs making up the retaliation instruction. The first two paragraphs of the retaliation instruction read as follows:

Plaintiff claims that she was singled out for more dangerous assignments, singled out for adverse treatment about her job performance, moved from her partner and her team, and/or refused to transfer her, and/or directed her to more dangerous calls by Defendant City of Chicago, through its agents because she complained about gender discrimination.

Plaintiff must *also* prove by a preponderance of the evidence that Defendant City of Chicago singled her out for more dangerous assignments, singled her out for adverse treatment about her job performance, moved her from her partner and her team, and/or refused to transfer her, and/or directed her to more dangerous calls because she complained of gender discrimination. To determine that Plaintiff Lewis was singled out for more dangerous assignments, singled out for adverse treatment about her job performance, moved from her partner and her team, and/or refused to transfer her, and/or directed her to more dangerous calls because she complained of gender discrimination, you must decide that Defendant City of Chicago would not have singled her out for more dangerous assignments, singled her out for adverse treatment about her job performance, moved her from her partner and her team, and/or refused to transfer her, and/or directed her to more dangerous calls if she had not complained of gender discrimination but everything had been the same. (emphasis added).

Lewis takes issue with the inclusion of the word "also" in the second paragraph of the retaliation instruction. Her argument is that since there was nothing in the first

paragraph of the retaliation instruction describing what else Lewis had to "prove," then the reader would naturally keep looking backwards in the instructions to give meaning to the word "also," and ultimately stumble upon the elements of the discrimination instruction. As a result, Lewis reasons, the jury could have understood the retaliation instruction to mean that she had to prove discrimination to prevail on her retaliation claim.

It's fairly clear that the stray "also" was included in the instructions by error. Here's what happened: After the close of evidence, the district judge sent the jury home for the day and conducted a jury instruction conference. The following morning, the City's counsel proposed an amended retaliation instruction which was "tendered" to the court. *See* Tr. at 936. The City's proposal added a new paragraph to the retaliation instruction. After reading the proposed instruction, the judge agreed with including the additional paragraph but said he wanted to switch the ordering of two of the paragraphs. The "also" made sense as the paragraphs were originally written but lost meaning when they were flip-flopped.

Including the stray "also" did not lead to the jury being misinformed. The jury very easily could have understood the distinction between the discrimination instruction and retaliation instruction. First, it heard closing arguments from counsel that treated the claims as being completely distinct, one not dependent on the other. Second, the retaliation instruction and discrimination instructions were separated by two pages of other instructions. The "also" may have quite plausibly been

taken to refer to those intervening pages or the first paragraph of the retaliation instruction itself, which identified Lewis's retaliation claims. We cannot say that the inclusion of the word "also" made the instructions so confusing and misleading that it resulted in the jury being conveyed an incorrect message. *Dawson*, 135 F.3d at 1165.

More importantly, Lewis failed to object to the instruction. Rule 51(b)(2) requires a court to give the parties an opportunity to object to an instruction on the record and out of the jury's hearing before the instructions and arguments are delivered. FED. R. CIV. P. 51(b)(2) (2008). Under Rule 51, a court may remedy an error in the instructions that was not preserved if the error is plain and affects substantial rights. FED. R. CIV. P. 51(d)(2); *Griffin v. Foley*, 542 F.3d 209, 222 (7th Cir. 2008). In the context of challenged jury instructions, a party's substantial rights are affected so as to warrant reversal if the error is "of such great magnitude that it probably changed the outcome of the trial." *United States v. Noel*, 581 F.3d 490, 499 (7th Cir. 2009) (quoting *United States v. Peters*, 435 F.3d 746, 754 (7th Cir. 2006)).

Lewis claims she "did not see this revised instruction before it was read to the jury." Appellant's Br. at 23. This implies that it was somehow clandestinely passed to the judge without Lewis or her attorneys having a chance to see it. But the discussion of the changes to the instruction were made in open court. The City's proposed changes to the instruction were tendered to the judge, and there is no indication that Lewis's counsel

asked to see a copy or expressed any interest in reviewing the final language. The judge announced his revisions prior to reading the instructions to the jury. We have no reason to think Lewis would have been denied the ability to read the instruction had she expressed any desire to do so. Even without seeing the actual piece of paper, Lewis was orally made aware of all changes that were being made and could have promptly responded.

Consequently, although the opportunity to object in the time provided by Rule 51 was short in this case, the opportunity was nonetheless there. In fact, the very next portion of the transcript shows both parties obviously aware of their need to preserve objections and the opportunity to do so, as they quickly renewed previously unrelated objections to the instructions.

In sum, the error created by the stray "also" (if it may be called that) was not significant enough to affect Lewis's substantial rights or to likely change the trial's outcome. It stretches the imagination to suggest that the mistaken inclusion of one word in this set of jury instructions that span twelve pages made any difference in the outcome of the trial.

Lewis raises a few additional points, which she argues added to the confusion created by the presence of the stray "also." First, she claims Instruction No. 5 contained a confusing use of the word "and" which, according to Lewis, again impermissibly linked the discrimination and retaliation claims. The instruction said:

> In deciding Plaintiff Lewis's claims, you should not concern yourselves with whether Defendants' actions were wise, reasonable, or fair. Rather, your concern is only whether Plaintiff Lewis has proved that Defendant City of Chicago and/or Defendant Williams denied her the opportunity to participate in the IMF Detail in Washington, D.C. because of her gender, **and** whether Defendant City of Chicago took any of the actions identified in the previous instruction in retaliation for her complaint of gender discrimination. (emphasis added).

This instruction is a proper statement of law and follows the Seventh Circuit Pattern Instruction 3.07. It deals with an entirely separate subject matter from what is required to prove discrimination and retaliation. Instruction No. 5 simply warned the jurors not to substitute their own judgment for that of the City regarding matters outside of the concerns animated by Title VII.

Second, Lewis takes issue with the judge's reading of one of the verdict forms to the jury. Verdict Form 4 originally said that if the jury found that Lewis did not prove "retaliation" it must find for Williams on the "retaliation" claim. The verdict form should have said "discrimination." But this error was repaired immediately after the judge read the instructions, and was corrected on the verdict form that went back with the jury. Ultimately, then, the corrected verdict forms only helped to alleviate any problems caused by the stray "also" in the retaliation instruction, rather than compound it.

### 2. *The Jury Instruction Defining "Materially Adverse"*

Lewis also claims that the district court erred by submitting to the jury the question of whether the actions of the City amounted to a materially adverse employment action under the discrimination claim. She claims that submitting the issue to the jury ignores this Court's holding in *Lewis I*. Here's the relevant paragraph of the discrimination instruction as it was read to the jury:

> To succeed on this claim, Plaintiff Lewis must first prove by a preponderance of the evidence that the denial of the opportunity to participate in the IMF Detail in Washington, D.C. was a materially adverse employment action. Not everything that makes an employee unhappy is a materially adverse employment action. It must be something more than a minor or trivial inconvenience. For example, a materially adverse employment action exists when someone's pay or benefits are decreased; when her job is changed in a way that significantly reduces her career prospects; or when job conditions are changed in a way that significantly changes her work environment in an unfavorable way. The denial of an opportunity to earn overtime is a materially adverse employment action if the overtime is a significant and recurring part of an employee's total earnings. On the other hand, if the opportunity to earn overtime is insignificant and nonrecurring, it will not be a materially adverse employment action.

Lewis contends that the actions taken against her were materially adverse as a matter of law, and so the court

should not have posed the question to the jury. Whether the denial of Lewis's placement on the IMF detail constituted a materially adverse action was undeniably in dispute. This Court in *Lewis I* said it was a genuine issue of material fact. *Lewis*, 496 F.3d at 654. At trial, the City presented evidence that Lewis did not know how much overtime she would have earned, that there were several other equally beneficial details available to her, that the IMF detail was unglamourous while better training exercise opportunities existed in Chicago, and that she was not denied any subsequent assignments or promotions as result of not being able to participate. Lewis's reliance on *Henry v. Milwaukee County*, 539 F.3d 573, 585-86 (7th Cir. 2008), is misplaced because, in contrast to this case, the overtime opportunity in *Henry* was a significant and expected component of the plaintiffs' compensation.

It is true that some cases present obvious examples of materially adverse actions being taken against employees. For example, courts should not generally task juries with determining whether terminations, demotions or salary cuts are materially adverse actions. But there are times where the question is not so obvious, and this case presents one of those instances. *See* SEVENTH CIRCUIT PATTERN JURY INSTRUCTION § 3.01, Comment E (noting that if a fact issue arises as to whether the plaintiff suffered a materially adverse employment action, "a court should modify the instructions to provide the jury with guidance as to what this term means."). Because the degree of adversity suffered by Lewis was substantially in doubt, the jury was appropriately presented with the issue.

3. *Inclusion of "Materially Adverse" Requirement in Retaliation Instruction*

Lewis next takes issue with how the judge instructed the jury on what the term "materially adverse" means in the context of the retaliation claim. Lewis argues that the instruction did not correctly follow *Burlington Northern and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 67 (2006). Specifically, she takes issue with the following part of the retaliation instruction:

> To succeed on this claim, Plaintiff must prove by a preponderance of the evidence that the challenged actions are ones that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity.

It's difficult to make sense of Lewis's argument. The instruction is entirely consistent with the Supreme Court's opinion in *White.* As we noted in Lewis's prior appeal, the main take-away from *White* is that "the range of conduct prohibited under [Title VII's anti-retaliation] provision is broader than Title VII's [anti-]discrimination prohibition." *Lewis,* 496 F.3d at 654-55 (quoting *Phelan v. Cook County,* 463 F.3d 773, 787 (7th Cir. 2006)). The Supreme Court noted that for retaliation claims, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White,* 548 U.S. at 68 (internal citations and quotation marks omitted). In light of this, it's hard to see

how Lewis would conclude that *White* does not require proof of an "adverse action" in a retaliation case.

Lewis also argues that because *Lewis I* found that she had provided "sufficient evidence" of retaliation to show a materially adverse action (under the *White* definition), the jury didn't have to be asked whether the actions were materially adverse. 496 F.3d at 655. But, once again, *Lewis I* was reviewing the evidence under a summary judgment standard to determine if there was a genuine issue of material fact. After deciding that there was such an issue, it was then up to the jury to decide the question. After all, Lewis did not win on summary judgment, she merely defeated the City's motion. This Court's finding of "sufficient evidence" in a summary judgment context did not end the factual inquiry. It was perfectly valid for the district court to require the jury to determine if Lewis proved a "materially adverse" action, and to explain that term in a manner that was consistent with *White*.

### 4. *Instruction on Intentional Discrimination*

Lewis next argues that the discrimination instruction was improper because it required Lewis to prove that the Defendants "intentionally discriminated against her." She cites to *Huff v. Sheahan*, 493 F.3d 893 (7th Cir. 2007) and *Bohen v. City of East Chicago*, 799 F.2d 1180 (7th Cir. 1986), but those cases address hostile work environment claims. Lewis's hostile work environment claim was dismissed at summary judgment and not pursued at trial.

A plaintiff bringing a disparate treatment claim must prove intentional discrimination. The Supreme Court has stated that it is the plaintiff's burden to persuade "the trier of fact that defendant intentionally discriminated against the plaintiff." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *Gonzalez v. Ingersoll Milling Machine Co.*, 133 F.3d 1025, 1031 (7th Cir. 1998) ("Proof of intentional discrimination is required under a disparate treatment analysis."); *see also Waite v. Bd. of Trs. of Ill. Cmty. Coll. Dist. No. 508*, 408 F.3d 339, 343 (7th Cir. 2005). Lewis herself admitted this in her briefing when she wrote that "[t]his evidence is also necessary to prove discriminatory and retaliatory **intent**, which is **an essential element** under Title VII*." See* Appellant's Br. at 46 (emphasis added). The instruction requiring Lewis to prove intentional discrimination was therefore entirely appropriate.

### 5. *Mixed-Motive Instruction*

Congress amended Title VII in 1991 to allow for liability if a plaintiff proves that her gender (or other protected class) was a "motivating factor" for a defendant's adverse action. 42 U.S.C. § 2000e-5(g)(2)(B) (2009). The courts have developed instructions reflecting the amendment, advising juries that if a plaintiff proves that gender was a motivating factor, but the defendant shows it would have taken the adverse action anyway, then it must find the defendant liable but cannot award damages. *See* SEVENTH CIRCUIT PATTERN JURY INSTRUCTION

§ 3.01, Comment B and C. Circuits are split as to whether to apply a mixed motive instruction in all Title VII cases, *see id*. (citing EIGHTH CIRCUIT MODEL CIVIL JURY INSTRUC-TIONS § 5.01; NINTH CIRCUIT MODEL CIVIL JURY INSTRUC-TIONS § 12.1 & Comment; ELEVENTH CIRCUIT PATTERN JURY INSTRUCTIONS (CIVIL CASES) § 1.2.1)), or only in those cases determined to raise a question of mixed motives, *see id*. (citing *Watson v. Se. Penn. Transp. Auth.*, 207 F.3d 207, 214-20 (3d Cir. 2000); *Fields v. New York State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 121-24 (2d Cir. 1997)). This Court has yet to decide when it is appropriate to apply a motivating factor instruction.[2]

For situations in which a judge has decided to give the jury a mixed-motives instruction, the Committee on Pattern Civil Jury Instructions makes the following recommendation:

> Plaintiff must prove by a preponderance of the evidence that his [*protected class*] was a motivating factor in Defendant's decision to [*adverse employment action*] him. A motivating factor is something that contributed

---

[2]  The concurring opinion in *Boyd v. Illinois State Police*, 384 F.3d 888, 901 (7th Cir. 2004) (Posner, J., concurring), suggests that if a defendant decides to put on the mixed-motive defense, then a mixed-motive instruction is appropriate. The opinion goes on to posit that if the defendant argues the only reason for the adverse action was for a non-discriminatory reason, then he is "going for broke" by aiming for a complete defense, and so no mixed-motive instruction should be used. *Id*.

to Defendant's decision. If you find that Plaintiff has proved that his [*protected class*] contributed to Defendant's decision to [*adverse employment action*] him, you must then decide whether Defendant proved by a preponderance of the evidence that it would have [*adverse employment action*] him even if Plaintiff was not [*protected class*]. If so, you must enter a verdict for the Plaintiff but you may not award him damages. *See* SEVENTH CIRCUIT PATTERN JURY INSTRUC-TION § 3.01, Comment C.

This case does not present us with the appropriate context to choose sides in the circuit split because Lewis did not preserve the issue for appeal. She merely hinted at it, by proposing a three-paragraph instruction. The middle paragraph, the only one addressing mixed-motives, stated:

> Plaintiff is not required to prove that her gender was the sole motivation for the decision. Rather, Plaintiff's gender was a motivating factor if Plaintiff's gender made a difference in the decision.

The problem with this proposal is that it leaves out the very significant second sentence suggested by Comment C of the Pattern Instructions, the one that tells the jury what to do if it finds gender to be a motivating factor. Namely, the jury would have to decide whether the Defendants proved that they would have taken the same action even if Lewis was a man, and if so, enter a verdict for Lewis but not award damages. Even if a party is "entitled to an instruction," it is "required to tender an instruction that correctly stated the law in order to chal-

lenge the district court's refusal to use it." *Marshall v. Porter County Plan Com'n*, 32 F.3d 1215, 1220 (7th Cir. 1994) (citing *Northbrook Excess and Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 638 (7th Cir. 1991)). The Title VII amendment codified as Section 2000e-5(g)(2)(B) "seems to mandate two questions," *see Akrabawi v. Carnes Co.*, 152 F.3d 688, 694 (7th Cir. 1998) and Lewis's proposed instruction was missing half.

We also agree with the district court's assessment that Lewis abandoned her request for a mixed-motive instruction. *Lewis v. City of Chicago*, 563 F.Supp.2d 905, 912 (N.D. Ill. 2008). The transcript shows that during the jury instruction conference, the judge asked Lewis's counsel about her proposed instruction containing the motivating factor language. *See* Tr. at 909. The judge then asked about the City's own proposed instruction, which used the "materially adverse" language from the comments of Pattern Instruction § 3.01, but not any motivating factor language. *Id*. Lewis's counsel immediately responded that "we would be fine" with "changing ours, taking out the middle section." *Id*. at 910. This presumably referred to the middle paragraph of her proposed instruction—the one discussing gender as a motivating factor. Counsel for Lewis then recited an entirely new instruction on the record which did not have any "motivating factor" language. While counsel eventually did object to the instruction that the court settled on, she did so only with respect to the inclusion of the "materially adverse" language discussed above. *Id*. at 911-12. She did not lodge any objection to the exclusion of the "motivating factor" paragraph. *Id*.

In sum, Lewis did not preserve her objection. Merely tendering a proposed instruction is not sufficient to preserve an objection. *Consumer Products Research & Design, Inc. v. Jensen*, 572 F.3d 436, 439 (7th Cir. 2009). Lewis's proposed instruction asked if "gender made a difference in the decision." It is unclear how this instruction would have led to a different result than the one reached through the instruction that was given, which asked if the Defendants would have taken the same actions had Lewis "been male but everything else had been the same." They are both essentially "but for" instructions. Therefore, Lewis "cannot articulate how [she] was affected by the refused jury instruction." *Id*. at 439-40. Under the "light-handed" review of jury instructions, *see DiSantis*, 565 F.3d at 361, we cannot say that the exclusion of Lewis's proposed instruction affected her substantial rights. Nor can we say, in large part because it was not argued, that the jury probably would have found differently had it been given the full "motivating factor" instruction discussed in Comment C of Pattern Instruction § 3.01.

### 6. *Pretext Instruction*

Lewis next argues she was entitled to an instruction advising the jury that it could find the City's explanations for the actions it took to be a pretext. Of course, the subject of pretext comes from the *McDonnell-Douglas* framework. But the burden-shifting apparatus provided by *McDonnell-Douglas* is applicable only to pretrial proceedings. *Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th

Cir. 1994). "Once the judge finds that the plaintiff has made the minimum necessary demonstration (the 'prima facie case') and that the defendant has produced a[ ] neutral explanation, the burden-shifting apparatus has served its purpose, and the only remaining question—the *only* question the jury need answer—is whether the plaintiff is a victim of intentional discrimination." *Id.* (emphasis in original). The exclusion of Lewis's pretext instruction did not render the final instructions inaccurate, nor did it cause confusion for the jury. Lewis was free to argue that the explanations given by the Defendants were not believable and point to the evidence showing why. We find no error with the refusal to give a pretext instruction.

### 7. *General Instructions*

The district judge's website says that "[t]his court has adopted several general instructions that will be presumptively used in all cases." *See* http://www.ilnd.uscourts.gov/ judge/castillo/standingtr.pdf, ¶ 11. The general instructions address subjects such as the burden of proof, what constitutes evidence, and how a single credible witness can overcome a greater number of opposing witnesses on any specific point. Lewis claims the judge's failure to include his general instructions in her case constituted an error. We disagree.

Lewis did not make any objection regarding the failure to give the general instructions. Indeed, she admits that she did not realize the general instructions were not given until after the final instructions were

read and the jury retired to deliberate. Lewis claims surprise but it's difficult to see why. Rule 51(b) requires that the court "inform the parties of its proposed instructions . . . before instructing the jury and before final jury arguments." The judge did just that and the general instructions were not part of the set that the judge intended to give. There was no reason for Lewis to assume the judge would operate outside the bounds of that rule by giving instructions that were not part of the set formally proposed to the parties and not discussed at all during the instruction conference.

Lewis focuses on one instruction in particular that she claims should have been given—the "single witness" instruction, which informs a jury that the testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary. *See* Judge Castillo General Instructions, Appellant's Reply Supp. App. at 7. To the extent any damage was done by not providing this instruction, it was minimized by the fact that Lewis's closing argument explained to the jurors that they were entitled to believe her and find she met her burden despite the existence of possible witnesses she did not call. Though a closing argument cannot serve as a substitute for a court's jury instruction, *see United States v. Walters*, 913 F.2d 388, 392 (7th Cir. 1990), it can be accounted for when determining if there was plain error. *See United States. v. Jackson*, 569 F.2d 1003, 1010 (7th Cir. 1978). But in any event, Lewis has not shown how the absence of the general instructions could have affected her substantial rights or seriously affected the proceedings. *See Higbee v. Sentry Ins. Co.*, 440 F.3d 408, 409 (7th Cir. 2006).

**B. Evidentiary Rulings**

Lewis also appeals several evidentiary rulings made during the trial. Decisions to exclude evidence are given considerable deference, overturned only for an abuse of discretion. *Alverio v. Sam's Warehouse Club, Inc.*, 253 F.3d 933, 942 (7th Cir. 2001). A new trial is warranted only if the error has a substantial and injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice. *Cerabio LLC v. Wright Medical Tech., Inc.*, 410 F.3d 981, 994 (7th Cir. 2005). In addition, even if a judge's decision is found to be erroneous, it may be deemed harmless if the record indicates the trial result would have been the same. *Alverio*, 253 F.3d at 942.

*1. March 13, 2003 Injury*

The district court decided not to allow Lewis to testify or give evidence pertaining to the March 13 incident in which she was accidentally injured by a fellow officer during a forced entry into a home. The judge relied on Federal Rule of Evidence 403 finding that the probative value of the testimony was substantially outweighed by the danger of unfair prejudice. A district court is afforded a special degree of deference when deciding whether evidence is unfairly prejudicial under Rule 403. *Estate of Moreland v. Dieter*, 395 F.3d 747, 754-55 (7th Cir. 2005). It is a rare case where appellate courts will second-guess the judgment of the person on the spot, the trial judge. *Id.*

Lewis was hoping to convince the jury that the March 13 incident showed that Williams was purposely placing her in precarious situations in retaliation for her filing the discrimination complaint. But as the district judge noted, he allowed Lewis to present evidence on that point in various ways: by offering evidence that she was assigned to investigate a citizen's complaint by herself; that she was assigned to a "shots fired" call; that she was quickly transferred from partner to partner so that she couldn't establish a safe working relationship with any of them; and by diverting her from an in-progress burglary to a more dangerous assignment on March 13. *Lewis*, 563 F.Supp.2d at 918. So Lewis was allowed to present an abundance of evidence to support her claim that she was retaliated against by being given more dangerous assignments. She was simply not allowed to present highly prejudicial testimony concerning the fact that during one of those assignments, she was accidentally injured.

We agree with the judge's assessment that the blow-by-blow story of the March 13 incident—involving being accidentally hit in the head with a sledgehammer and sustaining a broken neck—was "highly inflammatory." *Lewis*, 563 F.Supp.2d at 918. Evidence is unfairly prejudicial, "if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *United States v. Zahursky*, 580 F.3d 515, 525 (7th Cir. 2009). The district judge fairly weighed the probative value of that evidence against the danger of unfair prejudice and correctly decided to exclude it. That determination was not an abuse of discretion.

*2.  Denial of Surgery*

Lewis also challenges the decision to exclude evidence related to the City's denial of her request for neck surgery, which she hoped to offer in support of her retaliation claim. The problem is that there was no evidence connecting Williams to the denial of surgery or showing that the decision-makers within the City's medical section had any knowledge of Lewis's Title VII complaint. Lewis conceded the point at trial when—during an offer of proof—she acknowledged that there was no evidence that the medical section had any knowledge of the EEOC charge. *See* Tr. at 234-35.

So the district court, using its discretion under Rule 403, excluded the evidence. The judge found that, in the absence of evidence that the people who denied the surgery knew that she filed a complaint of discrimination, such evidence had very little probative value. On the other side of the scale was concern that allowing Lewis and a host of medical witnesses to testify about the difficulty she was having in getting surgery might run the risk of the jury deciding the case based on sympathy for Lewis. *Lewis*, 563 F.Supp.2d at 919. The district court's decision to exclude the testimony was not an abuse of discretion.

*3.  EEOC Determination, Internal Investigation and the Promotion of Williams*

The next issue raised by Lewis concerns the district judge's decision under Rule 403 to exclude evidence

pertaining to the EEOC determination, the City's internal investigation, and the promotion of Williams.

Although administrative findings may be admissible under Federal Rules of Evidence 803(8)(C) and 801(d)(2), the district court "retains significant discretion as to whether [the determinations] ought to be admitted." *Halloway v. Milwaukee County*, 180 F.3d 820, 827 n. 9 (7th Cir. 1999). The EEOC decision into Lewis's claims stated only that it "determined that the evidence obtained in the investigation establishes reasonable cause to believe that Respondent denied Charging Party an overtime and training opportunity and retaliated against Charging Party by reassigning her in violation of Title VII." This states only a conclusion and does not provide much additional probative information, as the district judge found. *Lewis*, 563 F.Supp.2d at 919. It merely presents the question the jury was tasked with answering. And it could have confused the jury into thinking that the issue was already decided. *Tullos v. Near N. Montessori School, Inc.*, 776 F.2d 150, 153-54 (7th Cir. 1985) (finding no abuse of discretion where lower court excluded EEOC determination because its consideration "was tantamount to saying this has already been decided and here is the decision."). The same is true of the City's internal investigation, which actually exonerated Williams. The judge was persuaded that admitting either of the prior investigations in evidence would create a substantial risk that the jury would adopt the earlier conclusions. So he exercised his discretion, chose to remain consistent and excluded both. *Lewis*, 563 F.Supp.2d at 920 n. 4. This was not an abuse of discretion.

Lewis had argued the internal investigation was relevant because the exoneration of Williams served as a retaliatory measure against Lewis herself. But Lewis was not pursuing a claim based on a continuing hostile work environment, as was the case in *Velez v. City of Chicago*, where a failure to remedy was discussed as grounds for liability. 442 F.3d 1043, 1047 (7th Cir. 2006) ("An employer is liable for a hostile work environment claim if . . . the employer was 'negligent either in discovering or remedying the harassment.'") (quoting *Mason v. S. Ill. Univ.*, 233 F.3d 1036, 1043 (7th Cir. 2000)). Lewis had the burden of proving the discrete acts of retaliation. Even under Lewis's "failure to remedy" theory, this evidence does not go very far in proving her case for retaliation. A judge and jury would face difficulties if forced to navigate through a record muddled between intersecting and partially overlapping pieces of evidence presented during the investigation and the trial, submitted under differing evidentiary standards. The judge was free to conclude that the risk of confusion outweighed the probative value.

Lewis also challenges the exclusion of evidence pertaining to the promotion of Williams which occurred after she lodged her gender discrimination complaint. She claims that the City has a policy to reconsider the promotion of officers after they receive sustained allegations of discrimination, and since no such reconsideration occurred, she should have been able to use the promotion as a signal of discriminatory and retaliatory intent. She says the cover-up served as further retaliation and that a jury could infer it was done to protect Williams, a high-ranking officer with the Department.

The promotion of Williams offered little insight into the City's discriminatory and/or retaliatory treatment of Lewis herself, which was the actual matter at issue. So the evidence had very little probative value. By the same token, it would have been time-consuming to present. And it would also have shifted the focus from the actions taken against Lewis to the competing merits of Williams and whether he actually deserved a promotion. *See Manuel v. City of Chicago*, 335 F.3d 592, 597 (7th Cir. 2003) (finding speculative testimony about a supervisor's previous acts of racism to be unfairly prejudicial). Excluding the evidence concerning the merits of promoting Williams was well within the district judge's discretion.

### 4.   *Officer Warnings to Lewis to "Watch Her Back"*

Lewis next challenges the exclusion of statements from Officers Muhney, Oliver, Weatherspoon and Davis. Lewis contends these officers advised her to "watch her back" when responding to assignments given out by Williams, implying that he was plotting to take retaliatory action against her. The statements themselves had little probative value since they were not comments of the decision-maker himself. *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 986 (7th Cir. 2001) ("Statements by a non-decision-maker that amount to mere speculation as to the thoughts of the decision-maker are irrelevant to an inquiry of discrimination."); *Chiaramonte v. Fashion Bed Grp.*, 129 F.3d 391, 397 (7th Cir. 1997) ("Statements by inferior employees are not probative of an intent to discriminate by the decisionmaker.").

When Lewis tried to call Officer Davis at trial, she said that Davis would testify that he "saw Lieutenant Williams going off in the station." *See* Tr. at 636. The judge responded that if Davis "can testify as to the defendant's acting in a certain manner and relates that to the EEOC complaint, that's fine." *Id*. So it would have been permissible for the officers to testify if they saw from personal knowledge Williams ranting and raving about Lewis's discrimination complaint. But they could not simply be called to testify that Williams was "out to get her." That would have been utter speculation and highly prejudicial. The statements were therefore properly excluded.

For what it's worth, Lewis managed to get the evidence before the jury anyway. She was permitted to testify at trial that Officers Weatherspoon and Davis told her that Lieutenant Williams "went off" when he "found out about the [discrimination] complaint and they told me to watch my back, that he was definitely out to get me." *See* Tr. at 225. So Lewis got much of what she wanted in any event. Excluding the witnesses from testifying to their speculation that Williams was "out to get Lewis" was entirely proper.

### 5. *Other Acts of Discrimination and Retaliation Against Other Employees*

Lewis claims the judge wrongfully excluded evidence of other acts of gender discrimination and retaliation by the City. Lewis wanted to show acts taken by "other police supervisory personnel"—not Williams. In *Lewis I*, this Court affirmed summary judgment as to

Lewis's § 1983 claim against the City, for a lack of evidence demonstrating an express policy of discrimination or a widespread practice of ignoring discrimination complaints. *Lewis*, 496 F.3d at 656. Thus, the remaining issue at trial was whether there were acts of discrimination or retaliation aimed at Lewis, not anybody else. Accordingly, the judge correctly held that evidence of discrimination and retaliation against other employees would be of limited value. *See accord, Grayson v. O'Neil*, 308 F.3d 808, 816 (7th Cir. 2002) ("Evidence of generalized racism directed at others is not relevant unless it has some relationship with the employment decision in question."). The high likelihood of juror confusion and inherent delay that would surely accompany the disputes involved in the introduction of this evidence outweighed what little value could be gleaned from it.

## C. Propriety of Closing Arguments

Lewis additionally seeks a new trial based on allegedly prejudicial statements made by counsel for the City in their closing arguments. Specifically, Lewis takes issue with the City's criticism of her failure to produce other witnesses and evidence that would corroborate her story. For example, the City pointed out in closing that Lewis had not produced the officers who were riding in the squad car when Williams allegedly assigned her to assist with the narcotics call, or the officer who supposedly told Lewis that her SOS transfer request had been blocked by someone at an upper level. The City suggested to the jury that these events didn't actually

happen, and that "there is no corroboration [of] anything that she alleged happened in this case." Tr. at 1004.

Lewis argues that this was a misstatement of the law. She cites to Pattern Instruction § 1.18, which says, "[t]he law does not require any party to call as a witness every person who might have knowledge of the facts related to this trial. Similarly, the law does not require any party to present as exhibits all papers and things mentioned during this trial." *See* SEVENTH CIRCUIT PATTERN JURY INSTRUCTION § 1.18, Comment E. Lewis failed to object to the closing argument when made and has therefore waived the issue on appeal. Improper statements should be objected to when made, so as to give the trial judge a chance to correct any prejudice caused by the statement. *Doe By and Through G.S. v. Johnson*, 52 F.3d 1448, 1465 (7th Cir. 1995).

In any event, we find that the Defendants' closing did not create an improper missing witness instruction or otherwise unfairly prejudice Lewis. "Attorneys have more leeway in closing arguments to suggest inferences based on the evidence, highlight weaknesses in the opponent's case, and emphasize strengths in their own case." *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008). In *Littlefield v. McGuffey*, 954 F.2d 1337, 1347 (7th Cir. 1992), the Court found that an argument that "there's not a single witness, not a single witness put forth to corroborate any story that he was allegedly told," was not improper. The missing-witness rule "permits an inference of unfavorable testimony from the missing witness," but may only be invoked "if that witness is

peculiarly within the opposing party's power to pro-
duce." *Id.* at 1346. *Littlefield* drew a distinction between
asking a jury to infer that a missing witness's testimony
would be unfavorable (which is not allowed according to
the missing-witness rule) and asking a jury to question
a party's credibility because it produced no cor-
roborating evidence (which is permissible). *Id.* at 1346-47.
Since the City was attempting to show the latter, the
closing argument was appropriate.

**D.  Sufficiency of Evidence**

Lewis's final claim is that the verdict was against the
manifest weight of the evidence. The standard of review of
a trial court's decision to deny a motion for new trial on
this ground is "abuse of discretion." *Moore ex. rel. Estate
of Grady, v. Tuleja*, 546 F.3d 423, 427 (7th Cir. 2008). Chal-
lengers bear a "particularly heavy burden" because a
court will set aside a verdict as contrary to the manifest
weight of the evidence "only if no rational jury could
have rendered the verdict." *Id.* The reviewing court must
view the evidence in the light most favorable to the
prevailing party, leaving issues of credibility and weight
of evidence to the jury. *King v. Harrington*, 447 F.3d 531,
534 (7th Cir. 2006).

On the discrimination claim, the jury was entitled to
believe Williams when he testified that he never made
the discriminatory statements alleged by Lewis and that
he had no discriminatory intent. In *Lewis I*, we acknowl-
edged the IMF memo was direct evidence of discrimina-
tion, but only when reviewing it in the light most favor-

able to Lewis for purposes of summary judgment. *Lewis*, 496 F.3d at 652. We further stated that a genuine issue of material fact existed as to whether gender discrimination occurred. *Id*. Chief Maurer testified that the memo did not reflect an actual discriminatory policy, and that the City had no intent to treat female officers any differently than males.

Even if the jury did not believe Williams or Maurer on those points, it still could have concluded that there was no materially adverse action taken against Lewis. Whatever career benefits the IMF detail may have bestowed, a tactical officer in Lewis's position had the opportunity to participate in several other similar details each year. Lewis herself later worked on a security detail for the President and at a later IMF meeting held in Chicago. Other officers were denied the chance to go to the Washington, D.C. detail and still received promotions.

With respect to the retaliation claim, there was a reasonable basis for the jury to believe that the actions pointed to by Lewis were not retaliatory at all, but merely part of her job. For example, though she was told by Williams on October 4 to respond to a "shots fired" call, there was evidence that such calls occurred frequently in her district. She was with two other officers at the time. In fact, she and her partners were already responding to the call at the time Williams gave his order, so a jury could easily conclude that the assignment was not out of the ordinary or made with retaliatory motive.

For the March 13 incident, Lewis's own testimony left room for doubt as to whether it was actually Williams on

the radio re-assigning her to the narcotics assist. She said it was a male voice, but she was unsure if it was Williams or not. Williams typically began any radio call by identifying himself as "Beat 360," but no such signal was made on the call in question. Further, the City put forward evidence that assisting with narcotics calls was a normal part of an officer's job. Also, Lewis did not necessarily prove that assisting a narcotics team was somehow inherently more dangerous than investigating an in-progress burglary call, so the jury could have believed that she was moved from a riskier assignment to a safer one.

Lewis also argued that Williams retaliated against her by ordering her to investigate a CAPS complaint without a partner. Evidence showed, however, that he did not tell her to investigate the complaint immediately, but instead to wait for a uniformed officer to become available. That is precisely what Lewis did, and then conducted the investigation without incident. With respect to the CAPS reports that Lewis filled out, the jury was provided with enough evidence to conclude that they were "kicked back" to her because they were incomplete and required more details about her investigation, not because her supervisors were retaliating against her for filing dis-crimination complaints. The jury was free to examine the initial report, which was entered into evidence, see that it consisted of only three lines, and find it was justifi-ably returned to Lewis.

As for Lewis's request to transfer to the SOS unit, which would have moved her away from Williams's super-

vision, there was evidence that Chief Maurer made the decision to reject the transfer, not Williams. And Chief Mauer testified that he was unaware of Lewis's discrimination complaint. He also denied the three other requests from Lewis's district, demonstrating that his decision was not specifically directed against Lewis or made out of any retaliatory motive.

In sum, the City and Williams presented sufficient evidence to provide the jury a reasonable basis to find in their favor. The verdict was not against the manifest weight of the evidence.

## III. CONCLUSION

The decision of the district court is AFFIRMED.