In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 17-3079, 17-3125 & 18-1207

NATHSON FIELDS,

*Plaintiff-Appellee,*

*v.*

CITY OF CHICAGO, *et al.,*

*Defendants-Appellants.*

———————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:10-cv-01168 — **Matthew F. Kennelly,** *Judge.*

———————

ARGUED NOVEMBER 8, 2019 — DECIDED NOVEMBER 20, 2020

———————

Before SYKES, *Chief Judge,* and RIPPLE and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* These appeals stem from an action brought in 2010 by Nathson Fields, asserting claims under 42 U.S.C. § 1983 and state law against the City of Chicago and individuals including several Chicago police officers as well as two former Cook County prosecutors. The lawsuit alleged that the defendants violated Fields's constitutional rights as well as state law in their actions in fabricating evidence and

withholding exculpatory evidence in a criminal investigation that resulted in Fields's conviction for murder. After a retrial that resulted in an acquittal, Fields filed this civil suit, and the jury entered an award in his favor on a number of grounds. Two individual defendants, Chicago Police Detectives David O'Callaghan and Joseph Murphy, and the City of Chicago, now appeal.

## I. FACTS AND PROCEDURAL HISTORY

The § 1983 and state law claims in this case relate to the investigation and prosecution of Fields for the murders of Talman Hickman and Jerome Smith in 1984. Following a bench trial before Cook County Circuit Judge Thomas Maloney, Fields and his co-defendant Earl Hawkins were convicted of the murders. During the penalty phase, the prosecutors introduced evidence that Fields and Hawkins had also murdered Dee Eggers Vaughn and Joe White.[1] Fields and Hawkins were sentenced to death for the murders of Hickman and Smith, and the conviction and sentence were affirmed on appeal in 1990. Twelve years after the trial, in 1998, those convictions were overturned on post-conviction review based on evidence that Hawkins's attorney had bribed Judge Maloney to secure an acquittal and that Judge Maloney during the trial became concerned that he was being investigated by law enforcement and returned the bribe; that corruption undermined confidence in the outcome. Hawkins, who began to cooperate with federal law enforcement in 1987 following the

---

[1] Hawkins and Anthony Sumner—who first implicated Fields in both the Smith and Hickman murders and the Vaughn and White murders—later confessed to the Vaughn and White murders.

conviction, provided the evidence of the bribe. He also made a deal to testify for the prosecution in a retrial of Fields for the Hickman and Smith murders, in return for avoidance of the death penalty or life in prison without release. Under the plea agreement, Hawkins pled guilty to two counts of armed violence and received a sentence recommendation of 42 years on each count to be served consecutively. The plea agreement also stated that "[i]t is the intent of both parties that defendant Hawkins remain in custody until he reaches 72 years of age," which would be in 2027. R. 770-2 at 8.

In the criminal retrial of Fields for the Smith and Hickman murders, the prosecutors presented a different factual scenario than in the first, relying on Hawkins's testimony. Whereas Hawkins had been identified as a shooter in the first trial, he was portrayed as the getaway driver in the second trial and Fields and another individual were characterized as the shooters. Fields was acquitted in that retrial in 2009. He then sought a certificate of innocence, which was ultimately denied, and at the same time pursued this lawsuit.

The lawsuit alleged that Chicago Police Detectives David O'Callaghan and Joseph Murphy violated his constitutional rights in connection with his criminal trials by fabricating evidence, engaging in suggestive identification procedures, and withholding exculpatory evidence. Fields alleged that the withholding of evidence was done in accordance with a policy of the City of Chicago to withhold "street" files which were compiled by detectives and contained such exculpatory evidence. See *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988) (noting that "street files" are police files withheld from

the state's attorney and defense counsel and therefore unavailable as a source of exculpatory information for a prosecutor deciding whether to charge or a defense attorney).

Fields also included state law claims of malicious prosecution, intentional infliction of emotional distress, and civil conspiracy. The case proceeded to trial in March 2014, but after seven days of trial, the court declared a mistrial when the defendants introduced prejudicial testimony that the court had excluded in a pretrial *in limine* ruling. The second trial commenced in April 2014, and at the close of the month-long trial the jury found in favor of Fields on his due process claim against defendant O'Callaghan, and in favor of the defendants on the remaining claims. The jury awarded Fields $80,000 on his due process claim against O'Callaghan. All parties filed post-trial motions. O'Callaghan sought entry of judgment as a matter of law on the due process claim, and Fields sought an entry of judgment on his claim against the City, both of which the district court denied. Fields also sought a new trial as to the claims that were not decided in his favor as to the individual defendants, a new trial as to damages regarding the due process claim against O'Callaghan upon which he prevailed, and a new trial on his *Monell* claim against the City. See *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978). The district court granted Fields's motion for a new trial as to the claims found in favor of the individual defendants and the City, and for a new trial as to damages with respect to the O'Callaghan claim. O'Callaghan subsequently sought a new trial as to liability, arguing that the damages issue could not be separated from that of liability, and the court granted that motion. After another month-long trial, the jury found in favor of Fields against O'Callaghan and Murphy on one of his § 1983 claims, against the City on Fields's *Monell* liability

claim under §1983, and against O'Callaghan on a state-law claim for intentional infliction of emotional distress, and found for the defendants on the remaining § 1983 and state law claims. The jury awarded Fields $22 million in compensatory damages, and punitive damages of $30,000 against O'Callaghan and $10,000 against Murphy. O'Callaghan and Murphy (hereinafter the "individual defendants") and the City now appeal that jury determination.

We will not recap the evidence presented below in its entirety because such a comprehensive overview is unnecessary to the resolution of the issues before us and, with challenges before us to decisions made in two separate month-long trials, any such effort to do so for both trials would prove both voluminous and confusing. Instead, we present the relevant evidence in the discussion of each issue raised on appeal. For context, the district court summarized the evidence as follows:

> Fields contended, and the evidence supported, that O'Callaghan and Murphy falsified incriminating evidence and concealed favorable evidence, and that he was deprived of his liberty as a result. This includes evidence from which the jury reasonably could infer, among other things, that Murphy pulled a group of suspects, including Fields, more or less out of the air and turned them over to O'Callaghan; O'Callaghan in turn fabricated identifications by witnesses who had no real opportunity to see the perpetrators; Murphy caused the fabrication of a purported admission by Fields to Anthony Sumner; O'Callaghan had responsibility—perhaps along with others—to review a police investigative "street file" and provide it to Cook

County prosecutors; Murphy, too, had information placed in the street file (a request for photographs used to purportedly identify the perpetrators); and the street file, which was never turned over, contained information that a reasonably competent defense attorney could have used to show the existence of reasonable doubt.

Corrected Memorandum Opinion and Order 9-11-2017 ("Corrected Op.") at 3-4.


## II. CHALLENGES BY INDIVIDUAL DEFENDANTS

## O'CALLAGHAN AND MURPHY

O'Callaghan and Murphy raise a number of challenges to the court's evidentiary decisions in the last (third) trial, arguing that those errors individually and cumulatively warrant yet another new trial. We review a trial court's evidentiary decisions only for abuse of discretion. *Lewis v. City of Chicago Police Dept.*, 590 F.3d 427, 440 (7th Cir. 2009); *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 868 (7th Cir. 2005). "A determination made by a trial judge regarding the admissibility of evidence is treated with great deference because of the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of his familiarity with the case and ability to gauge the likely impact of the evidence in the context of the entire proceeding." *Doornbos v. City of Chicago*, 868 F.3d 572, 579 (7th Cir. 2017) (internal quotation marks omitted), quoting *United States v. Wash*, 231 F.3d 366, 371 (7th Cir. 2000). A new trial based on such errors will be granted only if the evidentiary errors had "a substantial and injurious effect or influence on the determination of a jury and the result is

inconsistent with substantial justice." *Lewis*, 590 F.3d at 440; *Doornbos*, 868 F.3d at 579.

The first evidentiary challenges address evidence that the defendants sought to introduce to rebut Fields's character evidence. According to the defendants, Fields was a high-ranking member of the El Rukn gang who nevertheless sought to portray himself as a peaceful building manager for an El Rukn property uninvolved in the El Rukn's criminal activities. They sought to rebut that perception with evidence that Fields had been convicted of murdering a rival gang member years earlier, that he was involved with El Rukn criminal activities prior to his arrest in 1985, and that he participated in the scheme to bribe Judge Maloney. The defendants assert that the trial judge abused his discretion in precluding such evidence.

## A. FBI wiretaps

The defendants first challenge the court's exclusion of FBI wiretaps regarding the scheme to bribe Judge Maloney. They sought to introduce a recording of Jeff Fort, the leader of the El Rukn gang, in a discussion conducted using coded words, asking whether Fields had been informed about the bribe of Judge Maloney, and being told by Alan Knox that Hawkins said that he had informed Fields about the bribe. The trial judge engaged in an extensive analysis of the admissibility of the wiretap evidence, determining that the recording was inadmissible hearsay. That determination is not erroneous. The defendants sought to use the recording to demonstrate Fields's connection to the bribe and the El Rukns. The state-

ments as to whether Fields was made aware of the bribe involved multiple levels of hearsay, in that it involved Knox's statement to Fort as to what Hawkins told Knox that Hawkins had said to Fields. The statements were used for their truth to connect Fields with the bribe by showing his knowledge of it. The defendants dispute that, arguing that the recordings related to orders from Fort and the orders were not being offered to prove the existence of the bribe. But the recordings were being used to prove that Fields had knowledge of the bribe and therefore was involved in bribing the judge, by showing that the El Rukns informed him of the bribe prior to the trial, and that uses the statements for their truth. In fact, in arguing that the residual hearsay exception applies, the defendants argue that Fields put his knowledge of the bribe squarely at issue and that they therefore should be allowed to rebut it. That argument acknowledges that the evidence was intended to demonstrate Fields's knowledge of the bribe. The district court properly determined that the use of the wiretap recordings for that purpose rendered it inadmissible hearsay that should be excluded.

Nor can the defendants succeed on their claim that an exception to the hearsay prohibition applies here. They assert that the wiretaps were admissible under the residual hearsay exception in Federal Rules of Evidence 807, which permits admission of hearsay if it is supported by sufficient guarantees of trustworthiness considering the totality of the circumstances and any corroboration, and it is more probative as to the point for which it is offered than could otherwise be attained by reasonable effort. The defendants argue that the wiretaps were "particularly trustworthy because the El Rukns were not aware they were being recorded and spoke in code." Indiv. Defs. Brief at 23. The speaking in code, however, signals

the opposite conclusion; it indicates an awareness that the communications could be intercepted. There is nothing in the nature of that communication that renders it "particularly trustworthy." See *Cody v. Harris*, 409 F.3d 853, 860–61 (7th Cir. 2005). Moreover, the recording is also not the most probative evidence demonstrating that Fields was informed about the bribe before the trial. The recordings relate Knox's statement that Hawkins told Knox that he told Fields of the bribe. But that fact was related to the jury directly by Hawkins. The district court allowed Hawkins to testify directly that he told Fields about the bribe, thus presenting the jury with that information in admissible form. See *Flournoy v. City of Chicago*, 829 F.3d 869, 876 (7th Cir. 2016) (notation on a police report not the most probative evidence under Rule 807 where others testified to the matter). The district court properly held that the wiretaps should not be admitted under the residual exception.

The district court also properly rejected the argument that the wiretaps were admissible as a co-conspirator statement under Federal Rules of Evidence 801(d)(2)(E). The court did not clearly err in determining that the defendants had not demonstrated that Fields was a co-conspirator in the scheme to bribe Judge Maloney. As the defendants acknowledge, that decision by the district court judge was based on the court's conclusion that Hawkins lacked credibility, and there is no reason to disturb that finding on appeal. The defendants have raised no meritorious claim that the district court erred in excluding the wiretap evidence.

### B. Possession of TEC-9

The defendants next object to the district court's exclusion of other evidence regarding Fields's character. According to the defendants, Fields presented himself to the jury as a "small fish" who was a building manager and not a hit man for the El Rukns. To rebut that characterization, the defendants argue that they should have been allowed to produce evidence that Fields was arrested in possession of a submachine gun while accompanying a group of fellow El Rukns who were stalking a rival gang member, Treddest Murray. They contend that Fields and other El Rukns planned to kill Murray and went looking for him, finding his car outside a bar, and that Fields was arrested and a TEC-9 submachine gun was found in the car in which Fields was riding. "The well-established, general rule is that a witness's credibility may not be impeached by evidence of his or her prior arrests, accusations, or charges." *Barber v. City of Chicago*, 725 F.3d 702, 709 (7th Cir. 2013); see also *Michelson v. United States*, 335 U.S. 469, 482 (1948) (dicta) ("Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty. Only a conviction, therefore, may be inquired about to undermine the trustworthiness of the witness.") The district court held that the charge against Fields was dismissed and that evidence of an arrest is generally not admissible for impeachment purposes, and that decision is well-founded. The defendants offer no argument on appeal addressing that holding by the court or distinguishing that caselaw.

Moreover, the district court noted that contrary to the defendants' assertion, the evidence at trial did not portray Fields

as a law-abiding person of peaceful character. The court emphasized that evidence was admitted that Fields:

- joined the El Rukn street gang;

- committed a serious crime for which he served 12 years in prison;

- concocted a false alibi and suborned others to assist in an unsuccessful attempt to avoid conviction for that crime;

- was involved in violent incidents in prison;

- became an officer in the street gang;

- resumed activities in the gang after getting out of prison; and

- voluntarily associated with killers and drug dealers in the El Rukn gang.

Defendants also introduced a significant amount of evidence regarding the illegal and violent activities of the El Rukn gang. … This evidence tainted Fields given his membership and rank in the gang.

Corrected Op. at 12-13. The district court, therefore, allowed the introduction of evidence as to Fields's character. The court did not err in refusing to allow evidence of an arrest, for possession of a weapon found in a car in which he was a passenger, in which the charge was later dismissed.

## C. Hunter and Clay

The defendants also challenge the district court's exclusion of the testimony of Eugene Hunter and Jackie Clay, through which they sought to portray Fields's role as an El Rukn killer. They argue that the district court erred in excluding the testimony for want of "foundation," arguing that no rule of evidence requires a foundation. But the district court's reasoning in excluding that testimony was well-grounded. Clay was allowed to testify that his duties in managing an El Rukn building included armed security and narcotics trafficking. The court allowed Clay to testify as to Clay's own building management responsibilities, but did not permit Clay to testify that those were the responsibilities of Fields as a building manager, because Clay acknowledged that he lacked personal knowledge of Fields's responsibilities. There is no error in limiting a witness's testimony to testimony within his personal knowledge. See Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *United States v. Fenzl*, 670 F.3d 778, 782 (7th Cir. 2012) ("a lay witness is permitted to base his testimony on his personal knowledge (and on nothing else)"); *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989). Because Clay was allowed to testify as to his own responsibilities as building manager, the defendants were free to argue

that by inference a jury should find that Fields had similar responsibilities. But there is no error in refusing to allow Clay to opine on a matter beyond his own personal knowledge. Similarly, Hunter admitted lacking personal knowledge that Fields was an "assigned killer," and that testimony was therefore properly excluded as well.

### D. Prisoner visitor list

The defendants next complain that the district court excluded the admission of Fields's prisoner visitor list that contained the names of persons authorized to visit him in prison and included a number of El Rukn names. The list was offered to demonstrate that Fields had a relationship with those El Rukns and to rebut Fields's claim that he did not associate with them. The court held, however, that the defendants had not presented competent evidence that Fields added those persons to the list. The names of Fields's family on the visitor list were written in Fields's handwriting, but the names of the El Rukns were in a different handwriting. And although the defendants planned to call some of the El Rukns on that visitor list as witnesses, counsel for the defendants informed the court that none of those witnesses were going to testify that they actually visited Fields. The defendants respond that they informed the court that Fields admitted that he approved the names on the list, and that admission is all that was necessary. But the cite for that proposition is just to the hearing on the motions in limine, and consists of a one-line statement by counsel for the defendants stating that Fields admitted he authorized the name; defense counsel did not identify the source for that admission, and has provided no cite in the brief before this court to such an admission anywhere else in the record.

Therefore, the court's holding that the defendants did not establish any foundation for that assertion is unchallenged. The district court did not abuse its discretion in holding that the visitor list was inadmissible.


### E. Stateville incident report

In addition, the defendants complain that the district court excluded a Stateville Incident Report and the testimony of Warden DeRobertis that two El Rukns, Derrick Kees and Hank Andrews, attempted to visit Fields in prison. As is true of a number of arguments in the briefs on appeal, their argument is replete with shorthand references to the record, such that the court has to go to that record in order to comprehend the basis of the argument. That is insufficient to preserve the argument to this court. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("even arguments that have been raised may still be waived on appeal if they are underdeveloped, conclusory, or unsupported by law"); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) ("[a] skeletal 'argument,' really nothing more than an assertion, does not preserve a claim."). For instance, after baldly stating that the court erred in excluding evidence of those attempts to visit Fields in prison, the defendants declare that

> [w]hile the court thought the corresponding Incident Report was hearsay, records of prison visits are admissible as business records under Rule 803(6) … [citations omitted] and as public records under Rule 803(8). DeRobertis' proffered testimony regarding this visit provided the factual background necessary under those rules.

Indiv. Defs. Brief at 29. That is the entire development of the argument that the exclusion of the Incident Report–a prison record of visit attempts—is being challenged, that the district court excluded it based on hearsay, and that the testimony by DeRobertis was sufficient to demonstrate that a hearsay exception applied. It is insufficient to preserve the issue on appeal. Missing is an explanation of the court's holding, the requirements of the business records and public records exceptions, and an explanation as to what testimony by DeRobertis meets the requirements of those exceptions. This is a problem that recurs in the briefing in this appeal, and we could well have held that some of those other arguments were insufficiently developed as well, but have erred on the side of considering them. The cursory treatment is even more problematic here because the district court held that the incident report involved multiple levels of hearsay in that it involved a recording of what other persons told him, and that the business record exception would only get the defendants past the first level of hearsay. The defendants do not address that issue at all. Therefore, the argument as set forth in this brief is insufficient to challenge the court's holding that the evidence of a visit was premised on inadmissible multi-level hearsay.

### F. 1972 murder conviction

Finally, the defendants argued that the court erred in excluding evidence that Fields was convicted of murder in 1972. The defendants claim that the court abused its discretion in excluding the 1972 murder conviction and that it was relevant

to damages because it was a factor the jury considered in imposing the death penalty. According to the defendants, the court erred in excluding it on the ground that the conviction was immaterial regarding damages because Fields's convictions for the Smith and Hickman murders alone rendered him death-eligible. The defendants argue that the court's determination rests on a legal error – a misunderstanding of Illinois death-penalty law – because even if Fields was eligible for the death penalty based on the Smith and Hickman murders alone, his 1972 conviction would nevertheless be considered by the jury as well as any other factors in aggravation and mitigation.

This argument is meritless. The district court did not misunderstand Illinois death penalty law. In fact, the court's explanation of the relevance of the 1972 conviction to the death penalty directly matches the defendants' explanation of that law. The court noted that Fields became eligible for the death penalty based on his conviction for the Smith and Hickman murders, and that the 1972 conviction was part of the aggravating evidence offered. The court rejected the argument that every factor in aggravation and mitigation that could contribute to the ultimate decision to impose the death penalty is relevant to damages for the misconduct related to his Smith/Hickman conviction. The court held that the 1972 conviction was not necessary to make Fields eligible for the death penalty, and that the precise reason why Fields received the death penalty after his conviction for the Smith/Hickman murders was immaterial to the damages calculation. Instead, the court held that the only material evidence is that which rendered him death eligible. Because the Smith/Hickman conviction alone rendered him death eligible, the damages resulting from the imposition of the death penalty were necessarily

related to that conviction. The defendants have failed to support their argument that all evidence introduced at the sentencing phase is relevant to the due process claim or to the damages for the due process violation. The district court properly limited the materiality determination to reflect that which subjected him to the death penalty, as opposed to inviting the reweighing of all aggravation and mitigation factors which would invite conjecture as to how the jury made that determination.

Moreover, the defendants' argument does not address the ultimate basis for the court's decision. The 1972 conviction was a conviction for murder based on an accountability theory. The court allowed the defendants to introduce that Fields was convicted of a crime, that Fields presented a false alibi defense at the 1972 trial and induced others to do so, and that he was imprisoned for 12 years for that offense. The only information excluded by the court was the nature of the conviction and the underlying information. The court held that given the age of the conviction, the potential for unfair prejudice – specifically the use of the murder conviction as inappropriate propensity evidence – outweighed any minimal probative value. That determination is entitled to deference and was not an abuse of discretion. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (noting that a district court is afforded wide discretion in evidentiary matters, particularly with respect to Rule 403 which can require "on-the-spot" balancing of prejudice and probative value for otherwise-relevant evidence).

G. Vaughn/White investigation

In addition to challenging the exclusion of evidence, the defendants also challenge the court's decision to admit evidence – including evidence regarding the investigation of the Vaughn and White double murder. They argue that the district court abused its discretion in allowing Fields to introduce evidence regarding the Vaugh/White investigation because that investigation was irrelevant and the evidence was offered solely to show O'Callaghan's alleged propensity to coerce false witness identifications. The defendants further argue that the evidence had no probative value. They argue that the evidence tainted Murphy as well, because Murphy was O'Callaghan's supervisor who Fields argued should have prevented the allegedly improper witness identification.

Although the defendants argue that the district court "did not engage in a meaningful Rule 403 analysis," that is belied by the record. The court heard oral argument on the matter, and ordered additional briefing specifically as to that issue, prior to making its decision. Moreover, the district court, in determining whether the probative value of the evidence outweighed its potential prejudicial impact, had the benefit of having heard evidence in the context of the case as a whole in the first trial which ended after 7 days in a mistrial, and in the second, month-long, trial. The court therefore was well-situated to assess the relevance of the evidence and its potential for misuse.

The court did not abuse its discretion in allowing the admission of the evidence in this case. Although the defendants portray the Vaughn/White investigation as distinct from the Smith/Hawkins investigation, and unrelated to it, the court properly rejected that characterization. The court noted that

the intent of the individual defendants was directly in issue as to Fields' malicious prosecution claim, such that Fields had to demonstrate that they acted with malice, defined as acting for a purpose other than to bring the crime's true perpetrator to justice. As to Fields, the Smith/Hickman and the Vaughn/White investigations had the same genesis. Anthony Sumner was arrested and faced the death penalty for the Vaughn and White murders. To better his situation, Sumner offered information as to crimes committed by El Rukns, including seven murders. At that time, he implicated Fields in both the Vaughn/White and the Smith/Hickman double murders. Therefore, the investigation of Fields for the Smith/Hickman murders arose from the statements made by Sumner implicating him in both double murders and the investigations as to both proceeded at that time. Fields sought to demonstrate at trial that O'Callaghan had reason to know very early in the investigation that Sumner's statements implicating Fields in the Vaughn/White murder were not credible, and that he fabricated evidence to nevertheless implicate Fields in that double murder. That calls into question whether Sumner's implication of Fields in the Smith/Hickman double murder could have been considered credible by O'Callaghan, and whether he acted in good faith in pursuing that charge.

The court held that "[i]f Fields can show that an individual defendant deliberately took steps to fabricate or conceal evidence in connection with Vaughn/White, it tends to make it more likely that the same defendant acted deliberately—i.e., with malice—in connection with Smith/Hickman." Order Regarding Evidentiary Issues Addressed on 11/15/2016 at 9. Because Sumner implicated Fields in the two double murders at the same time, and with the same incentive to deceive so as to receive a reduced charge and sentence, the

actions in response to both double murders are relevant, or so the district court could properly determine. The court held that "Federal Rule of Evidence 404(b) specifically permits use of other act evidence – if that is what this is, which is perhaps questionable given the intertwining of the matter – to show a party's intent or motive." Corrected Op. at 30. Our review is quite limited in analyzing evidentiary decisions by the court, and we find no abuse of discretion in the district court's conclusion that actions with respect to the Vaughn/White investigation were relevant to demonstrate the intent as to the Smith/Hickman investigation given their common inception and overlap. *Doornbos*, 868 F.3d at 579.

## H. Morris affidavit

In yet another challenge to the court's evidentiary decisions, the defendants contest the admission of the 2011 affidavits by Gerald Morris to impeach Morris's criminal trial testimony. Morris provided witness testimony at the criminal trial identifying Fields as a perpetrator. He subsequently retracted that identification of Fields, and provided affidavits to that effect. Morris was unavailable to testify at trial, and the district court allowed the use of those affidavits at trial pursuant to Federal Rule of Evidence 806, which allows the use of statements to impeach a declarant's hearsay statement. The defendants object to the applicability of that Rule on the ground that Morris's criminal trial testimony was not used for its truth, but rather was used for the non-hearsay purpose of allowing the jury to assess the materiality of the allegedly withheld and fabricated evidence underlying the due process claim. The district court properly rejected that argument. In

addition to using the transcripts for that non-hearsay pur-
pose, the defendants also used Morris's criminal trial testi-
mony for a hearsay purpose—to prove Fields's guilt of the
Smith/Hickman murders, a purpose that relied on the truth of
Morris's testimony. In fact, in determining that the testimony
was being used for a hearsay purpose, the district court
quoted opening arguments by counsel for the defendants,
pointing to the eyewitness testimony of Morris and two other
persons to show that Fields was guilty of the murders. There-
fore, the argument that Morris's testimony was used only for
non-hearsay purposes is meritless. With Morris unavailable at
trial, the court did not err in finding that the Morris affidavits
could be admitted under Rule 806.

The defendants' argument that the prejudicial impact out-
weighed the probative value is also unavailing. As the district
court recognized, the defendants were able to present their
own out-of-court statements by Morris disavowing state-
ments in the affidavits, and were also able to introduce evi-
dence as to the circumstances under which the affidavits were
obtained to attempt to discredit those affidavits. The court's
reasoned weighing of the Rule 403 factors was not an abuse of
discretion. Nor did the court abuse its discretion in refusing
to reopen discovery to allow the defendants to depose Morris
following the 2014 month-long trial and before the 2016 trial;
discovery had long been closed and a month-long trial com-
pleted before the request was made, and the court reopened
discovery before the 2016 trial only as to the narrow issue
upon which the new trial motion had been granted. Moreo-
ver, the court noted that there was ample opportunity for ei-
ther party to take Morris's deposition before discovery closed
for the 2014 trial, and that it specifically permitted that. Dis-
trict court judges are accorded broad discretion in discovery

matters, and therefore our review is deferential and only for abuse of discretion. *Kuttner v. Zaruba*, 819 F.3d 970, 974 (7th Cir. 2016); *Thermal Design, Inc. v. Am. Soc'y of Heating, Refrigerating & Air-Conditioning Engineers, Inc.*, 755 F.3d 832, 837 (7th Cir. 2014). Regarding temporal limitations on discovery, we have asked whether some time limit was warranted and, if so, was the time limit imposed a reasonable one that allowed the parties a meaningful opportunity for discovery. *Kuttner*, 819 F.3d at 974. Here, the parties had an opportunity to take Morris' deposition prior to the first completed trial, and it was reasonable for the district court to ensure that the second full trial did not get unnecessarily delayed by a reopening of the discovery and evidentiary decisions already made in the first full trial. The defendants have failed to demonstrate any abuse of discretion in the court's decision to limit the reopening of discovery in that manner.

## I. Whiteout question

Finally, the defendants argue that the district court erred in allowing Fields's attorney to "accuse" Murphy of whiting out the notes of his debriefing of Sumner. They argue that there was no good faith basis to ask Murphy if his notes of the Sumner interview were whited out, and that the baseless accusation that the notes were redacted was therefore improper. See *United States v. Beck*, 625 F.3d 410, 418 (7th Cir. 2010). They allege that the unsupported allegation prejudiced Murphy, and that the court erred in refusing to take remedial action.

This argument is without merit, because a good faith basis for the question is apparent in the record. The copy of the contemporaneous handwritten notes taken by Murphy of his interview of Sumner had gaps within it containing blank spaces

that appeared unrelated to the organization of the notes as a whole in that it did not match the structure of the notes generally. The original of the notes was not provided. When Murphy hand-wrote the General Progress Report ("GPR") a year later, memorializing those notes in the proper form, some sentences contained language not in the original notes, but which could have been in the portion that corresponded to the blank gaps. For instance, a sentence in the handwritten notes that states "Earl [Hawkins] got Fields and Carter" has nothing after it, but has a noticeable blank space both immediately following as well as a blank line below it, in contrast to the rest of the handwritten bullet points that have no blank line in between them. In the GPR, Murphy has written "Hawkins related that he got Nathson Fields and George Carter to shoot 'Freddy' because they were not known in the neighborhood." That difference in wording, in conjunction with the white spaces that deviated from the general format, provided a good faith basis to ask whether the gaps reflected white-outs. See *Beck*, 625 F.3d at 418 ("an attorney does not need definitive proof to have a good-faith basis, just '[a] well reasoned suspicion that a circumstance is true.'"). Moreover, the defendants could not demonstrate that the questioning resulted in the type of a substantial and injurious effect or influence on the determination of a jury that would require yet another trial. *Lewis*, 590 F.3d at 440; *Doornbos*, 868 F.3d at 579. There is no reversible error in the court's decision to allow the questioning.

### III. CHALLENGES BY CITY OF CHICAGO

We turn to the challenges raised by the City of Chicago which involve both trials. First, the City challenges the court's

decisions to grant a new trial following the first full trial, on the claims of the individual defendants and, by extension, the claim of *Monell* liability. In addition, the City contests the denial of its motion for judgment as a matter of law as to *Monell* liability following the second full trial. We consider them in turn.

The City, joined by the individual defendants, challenges the district court's decision to grant a new trial as to individual and *Monell* liability following the jury verdict in that first completed trial. We review a trial court's grant or denial of a new trial for abuse of discretion. *Browder v. Dir., Dep't of Corr. of Illinois*, 434 U.S. 257, 263 n.7 (1978); *Vojdani v. Pharmsan Labs, Inc.*, 741 F.3d 777, 781 (7th Cir. 2013). That standard of review recognizes that deference should be given to a trial judge who has had the benefit of observing the trial – in this case a trial that spanned a month.

## A. Rule 60 grant of new trial

We consider first the district court's grant of a new trial as to the claims of the individual defendants under Federal Rule of Civil Procedure 60(b), based on newly discovered evidence discrediting the representations that Hawkins would be imprisoned until 2027. The court held that Hawkins's release from prison mere months after his testimony in this civil trial evidenced a pretrial deal in which Hawkins received an accelerated release from prison in return for his testimony in favor of the defendants.

We begin with the district court's reasoning in granting the motion for a new trial as to the individual defendants. The court noted that Hawkins had received benefits in return for

his testimony in prior proceedings. Hawkins made a deal with both federal and state prosecutors and testified against Fields in Fields's 1999 murder retrial. Under the plea agreement, Hawkins – who had received the death penalty in the first criminal trial – instead pled guilty to two counts of armed violence and received a sentence recommendation of 42 years on each count to be served consecutively. R. 770-2 at 7-8. He obtained further benefits in return for his testimony at the proceedings for Fields's petition for a certificate of innocence. Hawkins's plea agreement prior to that time provided that he agreed to cooperate with law enforcement and testify in return for two consecutive 42-year prison terms, totaling 84 years, to run concurrently to his federal prison term. That plea agreement explicitly provided that it was the intent of both sides that Hawkins would remain in custody until age 72, which would be the year 2027. *Id*. at 8.

In conjunction with his testimony against Fields on his petition for a certificate of innocence and civil trial, Hawkins entered into a revised plea agreement with the Cook County States' Attorney which reduced his prison sentence to two consecutive 39-year terms, for a total of 78 years. The revised plea agreement eliminated the statement regarding Hawkins serving until the age of 72, replacing it with language stating that "[i]t is the intent of both parties that defendant Hawkins not serve any additional time in state custody beyond what he is already serving in his federal sentence. Defendant Hawkins will receive credit for time spent in state custody dating back to his original arrest on May 18, 1985." Dist. Ct. Memorandum Opinion and Order 4-6-15 ("Mem. Op.") at 14. In a joint deposition covering both the certificate of innocence proceedings and the present civil case, Cook County Assistant States' Attorney Brian Sexton provided testimony so as to

"place on the record" the understanding as to the revised plea agreement. Sexton testified that the understanding in the original plea agreement had been that the state and federal sentences would be served concurrently, such that all of his sentence could be served in federal custody with no additional state time following the expiration of his federal sentence. Sexton noted that there had been some confusion and that the original "out date" from the Bureau of Prisons on the federal sentence had been 2016, but provided a letter from the AUSA William Hogan clarifying that Hawkins' actual "out date" on the federal sentence was 2027. Accordingly, the state plea agreement was revised to provide for 39 years on each count, to be served consecutively, thus totaling 78 years for the state offenses rather than 84 years, and ensuring that the termination of the state sentence would coincide with the end of the federal one. That revision would ensure that Hawkins could complete his time in federal rather than state incarceration, while still ensuring a release date of 2027. Sexton declared that the change was a clarification rather than a new agreement, to reflect the original understanding of the plea agreement. That letter from AUSA Hogan setting forth Hawkins' release date provided:

> As we discussed, the BOP calculates Hawkins's statutory release date as January 1, 2027, at which time he will have served 40 years of his 60 year federal sentence (i.e., his mandatory expiration date under the pre-guidelines law with credit for time served from September 19, 1987,the date of imposition of his Illinois murder sentence by Judge Maloney, and 10 days per month statutory "good time" pursuant to the provisions of former 18 U.S.C. § 4161). The "two-thirds date" and "projected satisfaction date" of 9-18-2016 shown on

page 2 of the Sentencing Monitoring Computation memo have no bearing on Hawkins's actual release date under former 18 U.S.C. §§ 4205 and 4206; as you have been advised by both me and Tony Merola of the BOP when we contacted him in approximately February 2002 on this issue, Hawkins will be "continued to expiration" (i.e., "max out" on his sentence) based on his criminal history, Offense Severity Rating and Salient Factor Score, and the provision in § 4206 that "there is a reasonable probability that he will commit any Federal, State, or Local crime" if released before mandatory expiration.

*Id*. at 16-17. Thus, the deposition testimony as part of the present civil trial confirms that Hawkins would serve his term to the statutory release date of January 2, 2027, at the age of 72, based on his sentence and the relevant release factors of his criminal history, Offense Severity Rating and Salient Factor Score, and the reasonable probability of recidivism. As so portrayed, that was consistent with the original plea agreement which had explicitly recognized the intent of both parties that Hawkins remain imprisoned until 2027 at the age of 72, and therefore did not shorten his sentence.

As the district court noted, defense counsel repeated that representation throughout the trial, emphasizing that Hawkins would be imprisoned for life and that he was receiving no deal in return for his testimony at the civil trial. Defense counsel called Hawkins to testify, and elicited testimony from him to that effect:

Q: And is it true that you will not be released from the penitentiary until you are 72 years of age?

A (Hawkins) :    I never agreed to that. That's what they said. I thought my time would be up when my 60 years was up in 2016.

Q: You have come to learn that you actually will remain in custody, isn't that true?

A: If nothing don't happen, that's what they're saying.

Q: Is that until 2028, do you know?

A: No. I thought my paper said that I'm in jail until 2026, and at one time we went to

–

Q: We don't want to go into other matters.

THE COURT:     2026. He said he thought it was 2026.

MR. BURNS:     Very well, Judge.

*Id*. at 17. Although the defendants in this appeal seize upon the "[i]f nothing don't happen" language as indicating that he could obtain an early release under his current sentence, the only plausible meaning in light of the unequivocal statements at the deposition was that he would be imprisoned until at least 2026 under the current agreement, and would serve that time unless something happened such as another revision of the plea agreement in the future. His subsequent statement that he would be in jail until 2026 reaffirms that understanding.

As the district court noted, "[s]omething did happen." Less than three months after his testimony in this civil case, Hawkins received a parole hearing at which the examiner

noted that AUSA Hogan was listed as his representative and could not appear but would be sending a letter in support of Hawkins. The Parole Commission then received letters from Hogan, Sexton, and defendants Daniel Brannigan (a defendant in the civil case in the first full trial who is no longer in the case) and O'Callaghan. Hawkins was granted immediate release on federal parole, at which time the terms of the revised plea agreement ensured a release on the state charges as well. Therefore, within a few months of testifying in favor of the defendants against Fields, Hawkins' term of imprisonment—which originally would have provided for a release in 2027 on the federal charge and a nearly identical sentence on the state charges—morphed into a September 2014 release on both federal and state charges. The district court could properly hold that the timing and the coordination of letters between Hogan, Sexton, and the defendants, as well as the pretrial machinations to restructure the language of the state plea agreement, evidenced a deal that existed pretrial to provide an early release in exchange for Hawkins's testimony at the civil trial.

As stated earlier, we review the district court's grant of Rule 60(b) relief only for abuse of discretion. "An abuse of discretion on a Rule 60(b) motion 'is established only when no reasonable person could agree with the district court; there is no abuse of discretion if a reasonable person could disagree as to the propriety of the court's action.'" *Lee v. Vill. of River Forest*, 936 F.2d 976, 979 (7th Cir. 1991), quoting *McKnight v. United States Steel Corp.*, 726 F.2d 333, 335 (7th Cir.1984). Under that highly-deferential standard of review, the defendants cannot show that they are entitled to relief here. The district court's decision granting relief under Rule 60(b) is not one as to which no reasonable person could agree.

### 1.  Rule 60(b)(2)

The court granted the motion for a new trial under Rule 60 based on the factors in Rule 60(b)(2), which has been interpreted as requiring the movant to show that: he had evidence that was discovered after trial, the evidence was not merely cumulative or impeaching, the evidence was material, he exercised due diligence, and the evidence is such that a new trial would probably produce a different result. *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 732 (7th Cir. 1999). First, the court held that the evidence of Hawkins's release and the circumstances surrounding it clearly arose after trial and evidenced a pretrial deal in which Hawkins received an accelerated release from prison in return for his testimony in favor of the defendants. That holding was well-supported in the record.

Moreover, the court held that although the evidence could be impeaching, it could not be considered *merely* impeaching. The court noted that the evidence indicated that the restructuring of his state court deal that appeared to make only a modest adjustment actually was a bonanza to Hawkins that had a direct connection to his testimony, and that the posttrial events reflected a pre-trial deal to obtain his early release in return for his testimony. The court did not err in determining that the evidence was not merely for impeachment. Evidence of the pre-existing arrangement with Hawkins certainly could be useful for impeachment purposes, but here the evidence is not merely impeaching because it demonstrated misrepresentation and fraud in the case. The newly discovered evidence does not merely cast doubt on the credibility of a witness, but rebuts the substantive evidence introduced into

the record by the defendants, and exposes the misrepresentations as to Hawkins's sentence that were part of discovery, the trial, and closing arguments. Such evidence implicates the integrity of the fact-finding process. Courts have regularly recognized that such claims of newly discovered evidence of false statements or fraud can fall under Rule 60(b)(2) as well as 60(b)(3). *Id.* at 722 (analyzing a claim of false testimony under Rule 60(b)(2)); *Gupta v. U.S. Atty. Gen.*, 556 F. App'x 838, 842 (11th Cir. 2014) (motion alleging the government committed a fraud on the court by presenting false evidence and withholding other evidence "alleged conduct within the ambit or Rules 60(b)(2) and (3)"); *Taylor v. Streicher*, 469 F. App'x 467, 468 (6th Cir. 2012)(allegation of newly discovered evidence that deposition testimony was false and misleading and constituted fraud on the court considered under both Rule 60(b)(2) and (b)(3)); *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391–92 (2d Cir. 2001) (evidence regarding Nash's fraud and possible perjury could properly be considered under Rule 60(b)(2) and therefore Rule 60(b)(6) claim rejected); *Abrahamsen v. Trans-State Exp., Inc.*, 92 F.3d 425, 426-28 (6th Cir. 1996) (district court granted relief under Rules 60(b)(2) and (3) on claim that defendant's attorney was aware that the defendant had made an inculpatory statement to tow truck driver but did not reveal that information, thus violating discovery orders and suborning perjury when allowing defendant to testify he had not made any such statement); *Washington v. Patlis*, 916 F.2d 1036, 1039 (5th Cir. 1990) (holding that a Rule 60(b) claim of newly discovered evidence of alleged perjury is more properly addressed under Rule 60(b)(2)); *Madonna v. United States*, 878 F.2d 62, 64 (2d Cir. 1989) (Rule 60(b)(2) "allows the court to relieve a party from a judgment if new evidence of fraud or mistake is discovered").

As the district court noted, in the deposition of Hawkins in this case, the parties were informed by Cook County prosecutor Sexton that Hawkins would be in prison until 2027 and that release date was confirmed in the letter from AUSA Hogan. Defense counsel then advanced that same argument in questioning Hawkins and in arguing the case to the jury at trial. In fact, in addition to the questioning of Hawkins set forth above, defense counsel in leading questions on cross-examination of Herschella Conyers – one of Fields's lawyers in his criminal case – elicited testimony that Hawkins would not be released until 2027 or 2028. Defense counsel expanded on that theme at closing arguments, mocking Fields's claim that Hawkins had received deals for his cooperation by stating that Hawkins "will be in the penitentiary until 2028 or 26" and that he would be locked up for "most of his life." R. 726 at 3072. In fact, defense counsel repeated that contention that no deals were made with the witnesses, stating that "[t]here was suggestion that we were cutting deals, Mr. Hogan was cutting deals. Mr. Hogan said, I cut no deals with these people. Motions were filed. Pleas were entered, 99 years, and that was reduced over the objection of the government. There was no side deals, no promises, no winks and nods." Doc. 726 at 3091-92; see also Doc. 730 at 475 ("We heard that again today. These people are getting deals. And you heard from Derrick Kees getting a deal. Let me be clear on this. I offered no one any deals. These are people that have testified consistently in these matters. To suggest that we are now involved with it?")

That evidence and argument was false in light of the knowledge of the pre-trial deal that could see Hawkins released within mere months. The defendants' participation in the hearing that obtained his release and their direct benefit from his testimony evidenced their prior knowledge of the

pre-trial arrangement for his early release. Both the timing of his release and the machinations pre-trial to modify the state plea agreement in a way that proved to be a bonanza rather than a "clarification" provide ample support in the record that the representations as to Hawkins's sentence were false.

The court further found that there was no viable claim of a lack of due diligence. The court detailed that Fields's attorney was told at the deposition that Hawkins would be imprisoned until 2027, was given a letter from the federal prosecutor that said the same, and defense counsel advanced the same view in questioning Hawkins at trial and arguing the case to the jury. The district court accordingly held that "[k]nowing what she knew at the time, Fields's counsel would have had no basis to doubt those statements. And there is no basis to believe that further inquiry on counsel's part during discovery, or prior to trial, would have turned up anything different." Mem. Op. at 20.[2]

---

[2] The district court in its opinion granting a. new trial described at length that sequence of events, from the misrepresentations at the deposition to questioning at trial to the early release—extensively quoting from the deposition and trial testimony to detail the trail of misrepresentations. The court then concluded that the restructuring of Hawkins's sentence that was portrayed as a "clarification" was actually a bonanza connected to his testimony, and that the post-trial events reflected a pre-trial deal. That is the claim of fraud and misrepresentation that we discuss under Rule 60(b)(2) and (b)(3), and the dissent's contention that this is a new issue unaddressed by the district court is inconsistent with the court's language and analysis. See Mem. Op. at 13-21, Order on City Defendants' Motion to Reconsider 4-27-15 at 1-2. Moreover, the district court issued its decision in the context of the briefing below, and although Fields based his claim on Rule 60(b) generally, the defendants-appellants properly recognized and analyzed Fields's argument as invoking claims of fraud and

Finally, the court held that the evidence that Hawkins's
trial testimony would lead to his near-immediate release
would have "cut at the heart of the defendants' case" given
"the critical role Hawkins played in the underlying events
and as a witness at trial," and held that it was reasonably
probable that such evidence would have produced a different
result in the present case. *Id*. at 21. In fact, defendant O'Calla-
ghan pointed to Hawkins's testimony implicating Fields in
another murder and in bribery as a basis to explain the low
damage award and to counter Fields's claim that an award of
$80,000 was shockingly inadequate for a due process violation
that resulted in 18 years of incarceration – of which 12 years
were spent on death row. The district court, having observed
the month-long trial as well as the 7-day trial that ended in a
mistrial, was is in the best position to analyze whether the
newly discovered evidence was material in light of the trial as
a whole, and to assess its likely impact. In this case, the district
court had the benefit of both a 7-day trial that resulted in a
mistrial, and a full month-long trial. No district court will
lightly grant a new trial after a month-long original trial, with
its corresponding burden on the jurors and the court itself.
There is no reasoned basis to question the court's determina-
tion that the evidence would have cut at the heart of the de-
fendants' case. Although not a basis for our decision to affirm,
we note that the court's perception of that significance was
borne out by the vastly different result in the subsequent trial.

---

newly-discovered evidence—based on misrepresentations as a deal re-
garding Hawkins's release date—that were cognizable under subsections
(2) and (3) of Rule 60(b), and discussed the legal arguments under both.
See Doc. 770. As we will discuss in footnote 4, issues so presented in the
district court are properly before us.

The district court did not abuse its discretion in granting a new trial pursuant to Rule 60(b)(2).

### 2. Rule 60(b)(3)

Although we can affirm based solely on Rule 60(b)(2), we note that claims of fraud and misrepresentation fall even more typically under Rule 60(b)(3). In the district court, Fields argued generally for relief under Rule 60 or Rule 60(b) in his filings without specifying the subsection, save a lone reference in one filing to subsection (b)(2). The defendants recognized that Fields's argument for post-trial relief fell within either of two subsections – as either newly discovered evidence under Rule 60(b)(2) or alleged fraud under Rule 60(b)(3). Doc. 770 at 1. The defendants accordingly addressed both provisions, arguing that Fields should not be allowed to conduct post-trial discovery and that his claims should be denied under both Rules 60(b)(2) and 60(b)(3).[3] *Id*. After granting the new trial under Rule 60(b)(2), the court held that it need not consider any other arguments for a new trial by Fields. On appeal, we are not limited by the argument credited by the district court, but can affirm on any basis apparent in the record, including Rule 60(b)(3) here.[4]

---

[3] The briefing as to the issue of Hawkins's release under Rule 60 was completed under a separate schedule than the other issues in the motion for a new trial. Accordingly, the defendants' response to the Rule 60 claims as to Hawkins are found in the City Defendants' Response to Plaintiff's Proposed Discovery Plan for Post-Trial Motions, Doc. 770, rather than in City Defendants' Combined Response to Plaintiff's Post-Trial Motions, Doc. 766. See Doc. 766 at 49.

[4] Fields asserted in his brief on appeal that we could affirm under Rule 60(b)(3), but although he developed the factual basis for the claim, he

Under Rule 60(b)(3), "a court may set aside a judgment if a party engaged in 'fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party.'" *Wickens v. Shell Oil Co.*, 620 F.3d 747, 758 (7th Cir. 2010). It is an extraordinary remedy granted only in exceptional circumstances. *Id*. at 759. A party seeking relief under that provision must demonstrate by clear and convincing evidence that: "(1) the party maintained a meritorious claim at

---

failed to develop the legal argument beyond one cite. We need not determine whether that presentation ordinarily would be sufficient to raise an issue here. We have held that we can affirm a district court even on grounds not raised at all by the appellee, as long as the argument was presented to the district court and the appellant had an opportunity to respond to the argument there such that the appellee did not waive it in that court. See *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012) and *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017); see also *Froebel v. Meyer*, 217 F.3d 928, 932–33 (7th Cir. 2000) (recognizing that a degree of leniency applies to the failure to raise all possible grounds for affirmance), *Shields v. Burge*, 874 F.2d 1201, 1210 n.2 (7th Cir. 1989) (noting that qualified immunity was not raised on appeal but that "[w]e may affirm the district court's decision on any ground that the record fairly supports and the appellee has not waived below."). That standard was met below, as the defendants-appellants in fact briefed the Rule 60(b)(3) issue there. Moreover, the appellants addressed the Rule 60(b)(3) issue in the brief on appeal as well, even complaining that "Fields primarily devotes his response, to a new argument: that the City 'perpetrated a fraud' to cover up a conspiracy to enter a secret deal with Hawkins, … [and] asserts that, even if Rule 60(b)(2) could not reach this supposed 'corruption of the judicial process,' a court could invoke Rule 60(b)(3) or (b)(6) to grant a new trial." The appellants devoted much of their reply brief to countering the Rule 60(b)(3) argument. Given that the appellant had the opportunity to address the argument both in the district court and on appeal, and did so, there is no impediment to this court's consideration of the issue as an alternative ground to affirm in this appeal.

trial; and (2) because of the fraud, misrepresentation or mis-conduct of the adverse party; (3) the party was prevented from fully and fairly presenting its case at trial." *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995); *Wickens*, 620 F.3d at 758-59. The rule applies equally to both intentional and unin-tentional misrepresentations, and protects the fairness of the proceedings and not necessarily the correctness of the verdict. *Id*.

Accordingly, we consider the court's reasoning in light of the factors of Rule 60(b)(3) in determining whether the court properly ordered a new trial. The court's findings establish all of those factors. There is no dispute that, mere months after Hawkins testified in the civil trial, he was released from prison – shearing 13 years of imprisonment from both his state and federal sentences. The district court held that the post-trial development of Hawkins's early release sheds light on pre-trial events, evidencing a deal in which his accelerated release from prison was interrelated with his testimony against Fields. As is set forth above, throughout the case the defendants and defense counsel misrepresented Hawkins's sentence and whether Hawkins's testimony in the civil trial could impact the amount of time he would serve. In fact, the misrepresentations were so comprehensive that the court held that Fields's attorney would have no basis to even ques-tion those statements. Specifically, the court recognized that given the testimony of Sexton and the letter in the record from Hogan, Fields would have had no basis to question the repre-sentation that Hawkins would be imprisoned until 2027, and that there was no basis to believe that further inquiry would have discovered that it was a misrepresentation. That holding is well-supported in the record, based on clear and convincing – indeed, undisputed – evidence including: that the plea

agreement was revised shortly before trial to eliminate the language that Hawkins's state sentence should result in his imprisonment until the age of 72 and instead track the federal sentence; that Hogan and Sexton represented in this case that the revision was a clarification not a modification that did not lessen his sentence and that he would be imprisoned until 2027; that counsel for the defendants repeatedly elicited testimony and argued that Hawkins would be imprisoned until 2027; that Hogan and Sexton in conjunction with two of the individual defendants in this civil case, then sought his immediate release before the Parole Commission within months of the conclusion of the trial; and that a few months after the trial, in 2014, Hawkins was actually released 13 years early.

The district court also recognized that the inability to argue that Hawkins's testimony was interrelated with an accelerated release adversely impacted Fields's ability to present his case fully and fairly. In fact, the court held that the evidence that Hawkins's trial testimony would lead to his near-immediate release would have "cut at the heart of the defendants' case" given "the critical role Hawkins played in the underlying events and as a witness at trial," and held that it was reasonably probable that such evidence would have produced a different result in the present case. Therefore, Fields established that he had a meritorious claim and that because of a misrepresentation, he was unable to fully and fairly present his case.

The defendants challenge the applicability of Rule 60(b)(3), but the arguments largely dispute the court's findings regarding the misrepresentations as to the release date, and as described above those findings are well-supported in the record. The defendants also argue that the decision of the

Parole Commission was not actually impacted by the letters urging a release, but that is irrelevant. Although it would be pure speculation to think that the letters were entirely immaterial to the outcome, that is the wrong question. It is irrelevant whether the release resulted from their actions; the relevant issue is whether the unequivocal representation that Hawkins would be imprisoned until 2027 and therefore could receive no benefit from his testimony at the civil trial was false, and the clear answer is that it was – and that the defendants knew that it was wrong, although even unintentional misrepresentations can fall within Rule 60(b)(3).

The defendants also argue that the restructured plea agreement did not rest on misrepresentations because its guarantee of an immediate release on the state convictions when his federal custody ended merely reflected the original intent to ensure he did not serve additional time in state custody. But the problem with the restructured agreement is not that it tied the state term to the federal term. The misrepresentation is the statement that the restructured agreement was merely a clarification of the original intent of the plea agreement and not a new agreement that would materially alter his sentence. The coordination of the release from federal and state charges would not be problematic if, as represented, the federal term would run until 2027. That proved to be false, as became apparent when he was instead released from that federal term 13 years early. Because of the restructured agreement, he was then also released from his state sentence 13 years early. Given that the original plea agreement explicitly provided that it was both parties' intent that Hawkins would be imprisoned until the age of 72 in 2027, the restructured agreement which allowed for his release 13 years earlier could not be a "clarification" of the original plea agreement that did

not modify the original intent. It obliterated that original intent by allowing for the earlier release, because it was based on a misrepresentation as to the end date for his federal term. And the removal of that language regarding the mutual intent that he remain imprisoned until age 72, even though its retention would not have been inconsistent with the "clarification" that he serve his time in federal custody, further indicates a design to engineer an early release. The district court's findings establish Fields's entitlement to a new trial under Rule 60, and therefore the court did not abuse its discretion in granting that new trial.

### B.  Rule 59(e) grant of new trial

The City also challenges the grant of a new trial under Federal Rules of Civil Procedure 59(e) on the claim of *Monell* liability. The court rested its decision to grant a new trial on two alternative grounds, either one of which the court deemed sufficient to necessitate a new trial. First, the court held that a new trial was necessary because its limitation on discovery prevented Fields from pursuing the evidence to support his claim of *Monell* liability. Second, the court held that its jury instruction on the *Monell* claim and its response to a question regarding *Monell* liability by the jury during its deliberations created jury confusion and prejudiced Fields. Because we uphold the decision to grant a new trial on the first ground regarding the limitations on discovery, we need not consider the alternate basis for the new trial based on the jury instruction and the response to the jury question.

"The critical question under *Monell*, reaffirmed in *Los Angeles Cnty. v. Humphries*, 562 U.S. 29 (2010), is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts

of the entity's agents." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017). Fields sought to establish that the City had a policy or practice of withholding exculpatory evidence by using separate files maintained by police officers in criminal investigations that were not provided to prosecutors in making the charging decisions or to defense counsel in discovery in criminal cases.

The court held that Fields was unfairly prejudiced at trial by its discovery rulings that prevented Fields from obtaining and investigating the "street" files held by police officers in the "basement" filing cabinets.

The district court refused Fields's request to lift the protective order as to those files, under which Fields's counsel could review the files but could not disclose any information to the public. Fields sought to make public the names of defendants for whom such street files were kept, arguing that such disclosure was necessary to contact the defense attorneys in those cases and to determine whether the material in the street files had been improperly withheld in the criminal case. Fields argued that the production and public disclosure of the files was necessary to ascertain the information to show a pattern or practice of *Brady* violations as relevant to demonstrate *Monell* liability. Fields also contended that the names of the defendants on those "street" files should be made public as a matter of justice to ensure that wrongful convictions could be redressed. The court, in denying the discovery request, focused on the latter purpose and rejected the request. The court also cautioned Fields against raising the issue again, stating that any further request would be summarily denied. The court left open the ability of Fields to seek to introduce evi-

dence from the files that was relevant to the case, but precluded disclosure of the files or the names. But the court later held that the only way Fields could argue that files were not tendered to defendants in other cases would be to bring in defense counsel from those cases – a feat rendered insurmountable by the prohibition on the disclosure of the information in the street files.

On considering the motion for a new trial, the district court held that Fields was unfairly prejudiced by the court's discovery ruling that "effectively prevented him from ascertaining whether evidence in files found in the so-called 'basement' file cabinets had been withheld from criminal defense attorneys in other cases." Mem. Op. at 10. The court stated that it had failed to properly appreciate the purpose for which Fields's counsel sought the files. In order to prove his claim of *Monell* liability, Fields had to demonstrate a pattern or custom of wrongdoing, and access to those street files that were withheld from criminal defense attorneys was critical to demonstrate that policy or practice. The district court recognized that a discovery ruling will entitle a party to a new trial only if it denied the moving party a fair trial, but held that its restriction on discovery in this case did so. See *Pickens v. Runyon*, 128 F.3d 1151, 1155 (7th Cir. 1997); see also *Kuttner v. Zaruba*, 819 F.3d 970, 974 (7th Cir. 2016) (relief may be proper where a denial of discovery results in actual and substantial prejudice). The discovery restriction rendered it impossible for Fields to attempt to prove that the police department's method of file maintenance and disclosure impacted anyone other than himself, and therefore made it "virtually impossible" for Fields to establish a policy of concealing exculpatory evidence in that manner. In fact, the court noted that defense

counsel emphasized that failure of proof in closing arguments in stating:

> There was no evidence presented as to any file, not one, that information was withheld from anyone . … But to suggest there's a widespread practice that exists that we withhold exculpatory or impeaching information, what case? We didn't hear a word about it … Is there evidence to support a widespread practice? No. No, there's not.

Mem. Op. at 11.

The court did not abuse its discretion in that decision. The discovery sought by Fields would have opened the door to exploring the extent to which the withholding of evidence was a systemic practice by the City, and to determining whether exculpatory information in those files had been disclosed to defense counsel in those other cases. The court's prevention of that discovery foreclosed Fields's ability to prepare and present the case for *Monell* liability. The court's recognition of that mistake after the month-long trial, and its willingness to correct it, was not an abuse of discretion. Because that ground alone supported the court's decision to grant a new trial as to *Monell* liability, we need not address the court's alternative basis for granting a new trial – that the instruction for *Monell* liability and the response to the jury question deprived Fields of a fair trial

### C. Rule 50 motion for judgment

In its final challenge, the City contends that if the decision to grant a new trial is upheld, then the decision of the jury in

the subsequent trial should be overturned and judgment entered in favor of the City. The City argues that in *Monell* liability cases premised upon a widespread practice or implicit policy, a plaintiff cannot succeed by showing only a single instance of unconstitutional activity pursuant to a facially constitutional policy. Applying that principle, the City asserts that although Fields presented evidence that exculpatory material was not disclosed to him, he needed evidence of similar *Brady* violations in other cases to prove a *Monell* claim. The City asserts that Fields proved that investigative materials were not disclosed to other individuals, but did not prove *Brady* violations with respect to those individuals because Fields did not provide a meaningful record of their criminal proceedings and therefore the jury could not determine whether any undisclosed material affected the result in other proceedings. The City argues that *Monell* liability was not established because, "[w]hen a municipal policy is facially constitutional, a 'series of unconstitutional acts' is necessary to demonstrate deliberate indifference to deficiencies in that policy." Brief of City at 46-47.

We have rejected that narrow interpretation of *Monell* liability, recognizing that "a risk of constitutional violations can be so high and the need for training so obvious that the municipality's failure to act can reflect deliberate indifference and allow an inference of institutional culpability, even in the absence of a similar prior constitutional violation." *J.K.J. v. Polk Cty,* 960 F.3d 367, 380 (7th Cir. 2020)(en banc). For that reason alone, the City's challenge cannot stand.

Moreover, Fields presented evidence of similar violations that provided notice to the City. The district court assumed that a plaintiff must show more than deficiencies specific to

his own experience, and held that "Fields's evidence, including evidence of systemic underproduction of police reports, was sufficient to show a systemic failing that went beyond his own case." Corrected Op. at 7. The court held that the City was on notice – from prior litigation and its own subsequent internal inquiry—of deficiencies in its record-keeping and record production practices that led to harm in some cases. Fields produced evidence that the City did not introduce policies sufficient to correct those known deficiencies.

Our review is a narrow one. Jury verdicts are accorded great respect, and on review we consider whether the evidence presented to the jury was legally sufficient to support the verdict against the City. *J.K.J.*, 960 F.3d at 378. In making that determination, we do not reweigh evidence, assess witness credibility, or otherwise usurp the role of the jury as factfinder, and we give the nonmovant the benefit of every inference. *Id.*; *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019). "To the contrary, we must affirm unless there is 'no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party.'" *Id.*, quoting *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 926 (7th Cir. 2004).

*Monell* recognized that "[a] local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010); *Monell*, 436 U.S. at 690; *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 674 (7th Cir.2009). "[A] 'city's policy of inaction in light of notice that its program will

cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution.'" *J.K.J.*, 960 F.3d at 378 (internal quotation marks omitted), quoting *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011). That failure to act will support *Monell* liability only if the City had notice that its programs would cause constitutional violations, which requires a showing of a "known or obvious" risk that constitutional violations will occur. *Id.* at 379, 381. That notice can be established in various ways, such as through proof of a prior pattern of similar constitutional violations, or through a demonstration that the need for governmental action is so obvious, and the inadequacy so likely to result in constitutional violations, that the failure to act constitutes deliberate indifference even in the absence of similar prior constitutional violations. *Id.* at 380. Regardless of the approach taken, "[t]he critical question under *Monell*, …, is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson*, 849 F.3d at 379.

Here, the district court properly recognized that "street files" were utilized by law enforcement officers and that a jury could find from the evidence introduced by Fields that there was a "systemic underproduction of exculpatory materials to prosecutors and defense counsel." Corrected Op. at 7 n. 8. The City argues that it was not enough for Fields to produce evidence of ongoing use of street files in which investigative materials were withheld, but Fields must also demonstrate that the withheld evidence would have affected the outcome of the criminal trial. Although knowledge of the risk of constitutional violations is necessary for *Monell* liability, the City's knowledge of that risk is unquestionable in this case. As the district court recognized, the City was aware as a result of

prior litigation that the use of street files and the failure to ensure the production of the evidence within those files presented a constitutional problem. In *Jones*, 856 F.2d at 996, we recognized that the custom of the maintenance of street files was department-wide and of long standing, and that a jury could therefore conclude it was consciously approved at the highest policy-making level for decisions involving the police department. See also *Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985). In fact, the City in *Jones* did not even contest that the use of such a practice presented a due process problem, although the City represented it had abandoned the practice. *Id*. at 995. The evidence presented in this case – that such street files were still being used and that exculpatory evidence from such files was still being withheld in criminal cases – allowed a jury to conclude that the City had failed to take the necessary steps to address that unconstitutional practice. Accordingly, the district court did not err in determining that there was a legally sufficient evidentiary basis for a reasonable jury to find for Fields on the issue of *Monell* liability.

The decision of the district court is AFFIRMED.

SYKES, *Chief Judge*, dissenting. The first trial in Nathson Fields's wrongful-conviction suit ended in a mistrial. The second resulted in an $80,000 verdict against one of the Chicago police officers involved in his criminal case. Fields moved for a new trial pursuant to Rule 60(b)(2) of the Federal Rules of Civil Procedure, which permits the court to grant relief based on newly discovered evidence. The judge granted the motion, and a third jury awarded $22 million in compensatory damages against two Chicago officers and the City, plus punitive awards of $30,000 and $10,000 against the officers.

The case should not have been tried a third time. Rule 60(b)(2) authorizes the court to grant a new trial based on newly discovered evidence *if* (1) the evidence was discovered after trial; (2) the moving party exercised due diligence in discovering it; (3) *the evidence is not merely cumulative or impeaching*; (4) the evidence is material; and (5) the evidence is likely to produce a different result in a new trial. *Harris v. Owens-Corning Fiberglass Corp.*, 102 F.3d 1429, 1434 n.3 (7th Cir. 1996). The new evidence at issue here was additional impeachment evidence concerning the precise terms of the deal offered to Earl Hawkins for his testimony in this case. That's insufficient as a matter of law to support a request for a new trial under Rule 60(b)(2).

The judge acknowledged that the new evidence was impeachment evidence. But he said it could not be considered "*merely* impeaching" because "[a]rmed with this evidence, Fields's counsel could have argued that Hawkins's testimony … should be disregarded in its entirety." It's hard to make sense of this reasoning. The judge's sole rationale for characterizing the new impeachment evidence as something

*other than* impeachment evidence is just a description of impeachment evidence.

My colleagues apparently agree; they do not defend this reasoning. Instead, they conclude that the new evidence "demonstrated misrepresentation and fraud in the case" and uphold the judge's Rule 60(b)(2) ruling on that basis. In the alternative, they reconstrue the judge's decision as if it were based on Rule 60(b)(3)—which permits relief on a finding of fraud or misrepresentation—rather than Rule 60(b)(2). Majority Op. at 30. These alternative grounds are not available to us. We may affirm on any ground fairly supported by the record *but only if* the appellee has preserved the argument in the district court. *Burns v. Orthotek, Inc. Emps.' Pension Plan & Tr.*, 657 F.3d 571, 575 (7th Cir. 2011). Indeed, "[o]nly if a party raises an argument both here and in the district court may we use it as an alternate means to affirm." *Tully v. Barada*, 599 F.3d 591, 594 (7th Cir. 2010). Fields did neither.

Rule 60(b)(3) permits a judge to grant a motion for a new trial upon a finding of "fraud … , misrepresentation, or misconduct by an opposing party." The burden to obtain relief under this rule is heavy: the proponent must establish *by clear and convincing evidence* that he has a meritorious claim and that he was prevented from fairly presenting that claim by the fraud, misrepresentation, or misconduct of the opposing party. *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995).

Fields did not argue fraud as an alternative basis for his request for relief under Rule 60(b)(2), and he never sought relief under Rule 60(b)(3). He neither cited the rule nor developed an argument under it. The judge likewise made

no mention of fraud in his Rule 60(b)(2) ruling, and he never discussed Rule 60(b)(3). He did not apply the heightened burden of proof or the applicable legal framework, nor did he make the findings required for relief under the rule. Accordingly, any argument about fraud—whether under Rule 60(b)(2) *or* Rule 60(b)(3)—is waived. *Duncan Place Owners Ass'n v. Danze, Inc.*, 927 F.3d 970, 973 (7th Cir. 2019) ("Arguments not raised in the district court are waived … .").

Indeed, any argument about fraud under *either* rule has been doubly waived. On appeal Fields did not make a fraud-based argument under Rule 60(b)(2), and he made no effort whatsoever to develop an argument under Rule 60(b)(3) as an alternative basis to affirm. His brief addressed *only* whether his new impeachment evidence provided an adequate basis for a new trial under Rule 60(b)(2) on the rationale actually offered by the judge. He mentioned Rule 60(b)(3) only once, and then only in passing, saying that "even assuming" the defendants could "formalistically sidestep" the application of Rule 60(b)(2), their "egregious misconduct could be corrected under Rules 60(b)(3) (misconduct by opposing party) or 60(b)(6) (the catch-all provision)." That's it.

Undeveloped and perfunctory appellate arguments are deemed waived. *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1063 (7th Cir. 2020). Fields therefore waived any substitute argument under Rule 60(b)(2) *or* Rule 60(b)(3), *both* in the district court *and* here.

The judge also granted a new trial based on certain arguments raised in Fields's alternative motion under Rule 59(e), essentially reversing himself on a jury-instruction issue and a discovery ruling. But this aspect of the judge's

posttrial decision pertained only to the *Monell* claim against the City. The legal error in the judge's Rule 60(b)(2) ruling requires us to unwind the order granting a third trial on the claims against the individual officers and reinstate the $80,000 judgment from the second trial.

Under the single-recovery rule, Fields can recover only once for his constitutional injury; a plaintiff is "entitled to only one recovery though different constitutional theories support liability and different officers were involved." *Swanigan v. City of Chicago*, 881 F.3d 577, 582 (7th Cir. 2018); *see also Janusz v. City of Chicago*, 832 F.3d 770, 774 (7th Cir. 2016). So even if the judge's Rule 59(e) ruling was sound, the single-recovery rule bars any additional recovery on the *Monell* claim.

Unwinding the judge's Rule 60(b)(2) order reinstates the $80,000 compensatory judgment, which brings the single-recovery rule into play. The City is on the hook for the reinstated $80,000 award against its officer. *See* 745 ILL. COMP. STAT. 10/9-102. And because Fields is entitled to only one recovery for his constitutional injury, he cannot receive *additional* compensation on a *Monell* theory. This case need not and should not have been tried a third time.

Accordingly, I would vacate the order granting a third trial based on the judge's legal error in the Rule 60(b)(2) ruling and remand with instructions to reinstate the verdict from the second trial. I therefore respectfully dissent.